811 So.2d 841 (2002)
MILE MARKER, INC., Appellant,
v.
PETERSEN PUBLISHING, L.L.C., Warn Industries, Inc., Richard E. Aho, and Daily Business Review, L.L.C., Appellees.
Nos. 4D01-510, 4D01-712.
District Court of Appeal of Florida, Fourth District.
March 27, 2002.
*843 Jane Kreusler-Walsh, Rebecca J. Mercier of Jane Kreusler-Walsh, P.A., West Palm Beach, and John B. Dichiara of John B. Dichiara, P.A., Fort Lauderdale, for appellant.
John H. Pelzer of Ruden McClosky Smith Schuster & Russell, Fort Lauderdale, and David Jacobs of Epstein Becker & Green, P.C., Los Angeles, California, for appellee Petersen Publishing Company, L.L.C.
POLEN, C.J.
Mile Marker, Inc. ("Mile Marker") timely appeals a final summary judgment entered in its defamation action in favor of Appellee Petersen Publishing, Inc. ("Petersen"). Upon consideration of argument of counsel as presented in briefs and at oral argument, and review of the rather voluminous record, we affirm the trial court's entry of final summary judgment in favor of Petersen, where Mile Marker has failed to introduce any evidence sufficient to support a finding Petersen acted with "actual malice."
This action arose in regards to an article published in the November 1997 issue of Defendant/Appellee Petersen's "4 Wheel & Off Road" magazine. Mile Marker is the manufacturer of a hydraulic winch, a mechanical device employed by off-road enthusiasts for hauling stranded motor vehicles out of hazardous conditions. At the pertinent time Mile Marker was the foremost manufacturer of hydraulic winches, which derive their pulling power from the power steering pump of the vehicle to which the winch is attached. The alleged defamatory article consisted of a comparison test of Mile Marker's two-speed hydraulic-powered Hypro winch versus Warn's electric spool winch, a.k.a. the "Hydraulic v. Electric Winch Shootout." As its name implies, Warn's winch is electrically powered, deriving its power from the battery of the vehicle to which the winch is attached.
Since its entry to the winch market in 1996, Mile Marker had consistently, and rather vocally, asserted that its hydraulic winch was in fact superior to electric winches. Mile Marker seemed intent on procuring comparison tests of its product and that of its electric winch competitors, requesting numerous truck-related publications to conduct such tests. Mile Marker even went so far as to conduct its own comparison test, which was videotaped, with copies freely distributed to its customer base. Sometime in December of 1996, Mile Marker's president, Richard Aho, contacted Jim Ryan, the publisher of "4 Wheel & Off-Road," requesting a comparison test of its winch versus an electric winch. Approximately six months later, David Freiburger, an employee of "4 Wheel & Off Road" and the eventual author of the subject article, contacted Mile Marker's products representative, Don Duguid, to see if Mile Marker was interested in participating in a comparison test article. Duguid expressed interest, which led Freiburger to contact Scott Salmon, Warn's sales representative. Freiburger claimed he chose Warn since they were the leader in the electric winch industry.
Freiburger then sent a letter dated July 8, 1997, to both Duguid and Salmon which detailed the ground rules of the comparison *844 test. In pertinent part, the letter provided, "[O]nce the story is written, it will be forwarded to both of you for comments prior to publication .... We'll consider your input in evaluating the test results, but not for changing the results or eliminating any testing categories .... The story will also draw conclusions on quality of components, ease of controls, winching characteristics under various ontrail conditions, and safety issues ... we may come up with other tests and observations when the competition is in progress." Duguid and Salmon both signed and dated the letter in acceptance on behalf of their respective manufacturers. Both companies requested to have observers present at the testing; said request was denied since in Freiburger's words he did not want to have to act as a mediator.
The two winches were tested over five days in the California desert. Each winch was attached to a 1975 Dodge Ramcharger in turn, and various tests were conducted. Present at the testing were Freiburger, fellow employee Rick Pewe, and their photographer, Tori Tellem. After the testing was conducted Freiburger sent a first draft of the article to Duguid, as promised in the July letter. The next day Duguid drafted an internal memorandum to company president Aho, which was also forwarded to Freiburger for his consideration. Although the memorandum raised a few questions regarding some of the figures cited in the article (e.g., cost, installation time, certain testing procedures), it expressly provided, "Overall, David [Freiburger], we [Mile Marker] are very happy with the article." A final copy of the comparison test article, reflecting various alterations that had been suggested by Mile Marker, was published in the November 1997 issue of "4 Wheel & Off-Road."
Shortly thereafter Richard Aho drafted a letter to the editor of "4 Wheel & Off Road" in which he questioned the soundness of some of the testing equipment and raised issue with Freiburger's driving abilities and the soundness of his conclusions as reflected in the article. This letter was published in the December 1997 issue of "4 Wheel & Off Road," immediately following publication of the "Winch Shootout."
One full year later Mile Marker sent Petersen a letter which provided they were in the process of preparing a defamation lawsuit in connection with the "Winch Shootout Article." The letter alleged the article had misrepresented the capabilities and performances of their winch, and listed various testing results to which they objected. Mile Marker formally filed its complaint in March of 1999, alleging it had suffered defamation at the hands of Petersen, and further alleging that Petersen and Warn had engaged in a civil conspiracy of which it was the target. Warn was eventually dismissed from the lawsuit rendering the civil conspiracy claim moot. Petersen moved for summary judgment on the defamation claim in September of 2000, which was granted, forming the basis of this appeal.
In its Final Order of Summary Judgment the circuit court laid out nineteen statements which Mile Marker claimed were defamatory. The list of alleged defamatory statements consisted of alleged falsified testing results, both specific ("After this test, the power steering fluid rose to 268 degrees, turned black and smelled like bacon") and general ("We attacked Surprise Canyon with the Mile Marker winch first and found it unable to drag the Dodge up to the first obstacle"), and conclusions derived therefrom ("We found the Warn winch faster, easier to use and more reliable in real trail conditions"). We affirm the circuit court's entry of final summary judgment in favor of Petersen where Mile Marker failed to present any record *845 evidence that the "Winch Shootout" article was published with "actual malice."
A common law claim for defamation requires the unprivileged publication (to a third party) of a false and defamatory statement concerning another, with fault amounting to at least negligence on behalf of the publisher, with damage ensuing. Thomas v. Jacksonville Television, Inc., 699 So.2d 800 (Fla. 1st DCA 1997). A communication is "defamatory" if it tends to harm the reputation of another as to lower him or her in estimation of community or deter third persons from associating or dealing with the defamed party. Id. at 803. Defamation actions often raise Constitutional concerns and First Amendment jurisprudence distinguishes between two classifications of plaintiffs: "private individuals" and "public figures." Private individuals are governed by the common law test as laid out above; as such, they need only allege negligence on behalf of the publisher in order to maintain a defamation action. However, where public figures are concerned, the state's interest in protecting the defamed subject's reputation is lessened, and as such, public plaintiffs must allege a higher level of mens rea on behalf of defendant publishers, in order to balance the attendant First Amendment concerns bound up with defamation and public speech.
As laid out in New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a public figure plaintiff must establish "actual malice" on behalf of the publisher in order to maintain a defamation action. Under the actual malice test a public figure plaintiff must establish that the disseminator of the information either knew the alleged defamatory statements were false, or published them with reckless disregard despite awareness of their probable falsity. Id. Furthermore, the claimant must prove the existence of actual malice by clear and convincing evidence. Lampkin-Asam v. Miami Daily News, Inc., 408 So.2d 666, 668 (Fla. 3d DCA 1981).
We find Mile Marker is a "public figure" in the constitutional sense. See Saro Corp. v. Waterman Broad. Corp., 595 So.2d 87 (Fla. 2d DCA 1992)(the "public figure status" of a defamation claimant is a question of law to be determined by the court). Under U.S. constitutional defamation law there are two classes of "public figures": "general public figures" of requisite fame or notoriety in a community who are always considered public figures, and "limited public figures" who have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. Gertz v. Robert Welch, Inc., 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). We find the "limited public figure" classification more germane to the instant case, and undertake our analysis accordingly.
Courts are to employ a two-step process in determining whether a particular claimant is a limited public figure or simply a private plaintiff. First, the court must determine whether there is a "public controversy." Id. In determining whether a matter is a "public controversy," the court should ask whether a reasonable person would have expected persons beyond the immediate participants in the dispute to feel the impact of its resolution. Id. We find there was a pre-existing public controversy in a segment of the population regarding the merits of hydraulic versus electric winches. Though winch performance may not be a topic on the daily evening news, clearly there is a segment of the population, namely off-road enthusiasts, winch owners, those contemplating winch purchases, and readers of "4 Wheel & Off Road" and similar magazines, who would be impacted by the resolution of the instant dispute. We distinguish the instant *846 case from an essentially private dispute, such as a divorce, which, regardless of the public's "interest" in the subject matter, is not a "public controversy." Cf. Time, Inc. v. Firestone, 424 U.S. 448, 453-4, 96 S.Ct. 958, 964-65, 47 L.Ed.2d 154 (1976). Surely Mile Marker, Petersen, and non-party dispute participant Warn recognized the results of a product comparison test would have ramifications beyond the immediate participants. See generally Steaks Unlimited, Inc. v. Deaner, 623 F.2d 264, 280 (3rd Cir.1980)(recognizing consumer reporting involves inherent matters of particular interest to the public in that it enables citizens to make better informed purchasing decisions).
After defining a public controversy, the court must then determine whether the plaintiff played a sufficiently central role in the instant controversy to be considered a public figure for purposes of that controversy. Della-Donna v. Gore Newspapers Co., 489 So.2d 72, 75 (Fla. 4th DCA 1986); Gertz, 418 U.S. at 345, 94 S.Ct. 2997. In analyzing the extent of a corporate defamation claimant's participation in a public controversy relating to its products, courts should examine the nature and extent of the advertising and publicity campaigns previously undertaken by the claimant, paying particular attention to the pursuit of a marketing strategy that emphasizes the controversy, e.g., the active solicitation of independent product testing and reviews. See Quantum Electronics Corp. v. Consumers Union of U.S., Inc., 881 F.Supp. 753 (D.R.I.1995)(noting where corporate claimants seek to influence the outcome of preexisting controversies they consequently invite attention, comment, and criticism). Additionally, the level of media access enjoyed by a particular claimant should be considered as part of the public figure calculus. See Gertz, 418 U.S. at 344, 94 S.Ct. 2997 (noting the state's interest in protecting public figures is less acute than its interest in protecting private individuals since public figures have assumed the risk of injury by voluntarily entering the public arena and they are less vulnerable to injury from defamatory falsehoods due to greater access to the channels of communication). Based upon our review of the record and applicable case law, we find Mile Marker is in fact a "limited public figure." Mile Marker had continuously pursued a marketing strategy that emphasized a comparison of its winches with their electric counterparts. Furthermore, on numerous occasions Mile Marker had sought, and obtained, independent product tests and reviews of its product as compared to electric winches, and the only evidence before this court establishes that Mile Marker in fact originally suggested the instant test that formed the basis for the subject article.[1] Mile Marker also enjoyed greater media access, consistent with public figure status, where Petersen published Richard Aho's letter to the editor immediately following the "Winch Shootout" issue, and Aho gave an interview to the Daily Business Review in which he publicized the claims raised in the instant suit.
Since Mile Marker is a public figure, on summary judgment it must present record evidence sufficient to satisfy the court that a genuine issue of material fact exists which would allow a jury to find by clear and convincing evidence the *847 existence of actual malice on the part of the defendant, Petersen. Lampkin-Asam, 408 So.2d at 669; see also Dockery v. Fla. Democratic Party, 799 So.2d 291 (Fla. 2d DCA 2001)(noting when a motion for summary judgment is brought by a defendant against a public-figure plaintiff, and thus the actual malice standard applies, summary judgments are to be more liberally granted). Where the defendant in a defamation action is a publishing organization, this "actual malice" must be "brought home to the persons in the [publishing] organization having responsibility for the publication." New York Times, 376 U.S. at 287, 84 S.Ct. 710. We find Mile Marker has failed to introduce any record evidence of actual malice, the requisite state of mind, on behalf of the publishing entity, Petersen.
We note there were no glaringly obvious errors (assuming there were errors at all) in the subject published article. Though Mile Marker alleges some of the test results "fly in the face of physics" we are hard-pressed to find such results in the article.[2] Rather the article included details of the testing procedures used, the correlative testing results, and conclusions drawn by the author regarding the winches' respective strength and weaknesses.[3] We find Mile Marker has utterly failed to introduce any record evidence that those responsible for publication within the Petersen entity, knew or should have known, the subject article contained defamatory falsehoods. Petersen introduced a sworn affidavit from its publisher which provided he had made the decision to publish the article, that he had known Freiburger for years, that he had always known Freiburger to be truthful and accurate in his reporting, and that he had no reason to doubt the veracity of any of the statements in the subject article. We find the publisher's reliance on Freiburger proper and reasonable where the article on its face consisted of objective testing results and conclusions drawn therefrom. See Dockery, 799 So.2d at 295 (noting publications that are in question in defamation actions are not to be dissected and judged word for word or phrase by phrase, but rather the entire publication must be examined); see also From v. Tallahassee Democrat, Inc., 400 So.2d 52 (Fla. 1st DCA 1981)(noting pure opinion based on facts which are set forth in article or which are otherwise known or available to reader or listener as member of public are protected by the Constitution and can not form the basis for a defamation action).
*848 We find Mile Marker has failed to meet its burden on Petersen's motion for final summary judgment, and accordingly the trial court's final summary judgment in favor of Petersen is affirmed.
AFFIRMED.
HAZOURI and MAY, JJ., concur.
NOTES
[1] Mile Marker speculates the subject comparison test was proposed by Warn, as part of a collusion between Petersen and Warn, one of its major advertisers, to attempt to harm Mile Marker's reputation. Mile Marker has introduced absolutely no evidence supporting this allegation, and in fact Mile Marker dismissed Warn from its suit, rendering its civil conspiracy claim moot.
[2] Clearly the article did not claim Mile Marker's winch turned the steering pump into "green cheese," the analogy provided by Mile Marker in its briefs and at oral argument. Rather, the article provides during one test the Mile Marker winch caused the power steering fluid to rise to 268 degrees fahrenheit, turn black, and smell like "bacon." Such result must not have been as preposterous as Mile Marker now claims, where immediately following the article's publication, Mile Marker instituted a new warranty on its products, to the effect it would replace any steering pump burned by its winch.
[3] We reprint the final two paragraphs of the article entitled "Conclusions" for illustrative purposes:

"Mile Marker tells the truth: Its winch will pull to the limit of its abilities repeatedly without a significant loss in performance. That may make it a good choice if you need to pull fences, drag trucks through great lengths of mud, or act as winch-hill master for a full day. But don't count on it to save your hide if the truck won't run-like if you've rolled or have hydraulic'd the engine. We burned two power steering pumps, but Mile Marker says this is unusual and offers a one-year warranty to replace your power steering pump if it fails while using its winch.
We found the Warn winch faster, easier to use, and more reliable in real trail conditions. True, it will smoke when overloaded and the amp draw on the battery is significant, but it was the only winch able to get us home from Surprise Canyon."