[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15692

_____

D.C. Docket No. 0:15-cv-61855-DPG

JAMES L. TURNER,

Plaintiff-Appellant,

versus

THEODORE V. WELLS, JR.,
PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(January 18, 2018)

Before DUBINA and HULL, Circuit Judges and RESTANI,[*] Judge.

HULL, Circuit Judge:

This appeal involves a law firm's investigation of the Miami Dolphins professional football organization. The National Football League ("NFL") hired the law firm of Paul, Weiss, Rifkind, Wharton & Garrison LLP and one of its partners, Theodore Wells, to investigate allegations of bullying within the Dolphins organization. After receiving Paul, Weiss's report, the Dolphins fired their offensive line coach, James Turner, in February 2014.

Paul, Weiss's investigation centered on the bullying of a football player, Jonathan Martin, who abruptly left the Dolphins team midway through the 2013 season. At the time, Martin was an offensive lineman in his second year with the Dolphins. After leaving a Dolphins facility on October 28, 2013, Martin checked himself into a hospital for psychological treatment. Later, Martin explained that he left the team because of persistent taunting from other Dolphins players.

After several months of investigation, Paul, Weiss published a 144-page report (the "Report") which concluded that bullying by other Dolphins players contributed to Martin's decision to leave the team. The Report also included several references to Coach Turner and opined that Coach Turner's unprofessional conduct played a role in Martin's struggles.

_____

[*]Honorable Jane A. Restani, Judge for the United States Court of International Trade, sitting by designation.

After being fired, Coach Turner filed suit in federal court against Defendant Paul, Weiss and Defendant Theodore Wells (collectively, "Defendants"), the authors of the report, alleging defamation claims under Florida law.

Turner attached a copy of the Report to his complaint. The district court dismissed Turner's complaint with prejudice for failure to state a claim, and Turner appealed.

After careful review, and with the benefit of oral argument, we affirm the district court's dismissal. We conclude that none of the challenged statements contained in the Report are actionable for defamation. Further, no alleged omission or juxtaposition of facts in the Report states a claim for defamation by implication. We also hold that Turner is a public figure who has failed to adequately plead that the Defendants acted with malice in drafting and publishing the Report.

## I. BACKGROUND

We recount the relevant events as set forth in Turner's complaint and the Report attached thereto.

### A. Coach Turner's Career

Coach Turner played college football at Boston College, where he served as team captain during the 1987 college football season. After graduating, Turner

began his coaching career at his former high school before serving as an offensive coordinator for an English semi-professional team.

In 1990, Coach Turner joined the United States Marine Corps, serving as a platoon commander and operations officer for four years in the Middle Eastern, Asian, and European theaters.  Following an honorable discharge in 1994, Turner returned to coaching football.  Between 1994 and 2011, Turner held various assistant coaching positions at Northeastern University, Louisiana Tech University, Harvard University, Temple University, the University of Delaware, and Texas A&M University before being hired as the Dolphins offensive line coach for the 2012 season.  Coach Turner served as the Dolphins offensive line coach until his termination in February 2014.

**B. Martin's Departure from the Dolphins**

At the beginning of the 2013 season, Jonathan Martin was a starting left tackle on the Dolphins offensive line.  The Dolphins drafted Martin in the second round of the 2012 NFL draft.  Martin played for four years at Stanford University.  By draft time, Martin had established himself as a talented offensive lineman.  The Dolphins immediately used Martin's talents, starting him every game during the 2012 season.  While his first year was challenging, Martin was pleased with his overall performance.

As recounted in greater detail below, Martin's fellow offensive linemen subjected him to extensive taunting during his first year, referring to him with crude and often racially-insensitive terms.  Martin's peers also disparaged his sister and mother with sexually explicit remarks.

Instead of fighting back, Martin decided to endure the harassment, believing that the bullying would subside after his rookie season ended with the Dolphins. But the taunting endured into the offseason, forcing Martin to realize that the bullying would likely continue into his second year with the Dolphins team.

According to Martin, the harassment continued and worsened during the 2013 season.  Within a few months, Martin had had enough.  On October 28, 2013, Martin abruptly left a team dinner at the Dolphins practice facility.  That same day, Martin checked himself into a hospital seeking psychiatric treatment.

Shortly thereafter, the national sports media began reporting that Martin had "gone AWOL."  The story quickly gained national attention.  Reports began to surface that Martin had been a victim of locker room bullying and harassment by his Dolphins teammates.

## C.  The Investigation

On November 6, 2013, the NFL announced that it had retained Paul, Weiss to conduct "an independent investigation into issues of workplace conduct at the Miami Dolphins" and to "prepare a report for the commissioner."  The NFL stated

5

that Paul, Weiss partner Theodore Wells would lead the investigation and that the report would be made public.

During the course of the investigation, Wells and other Paul, Weiss partners, associates, and paralegals interviewed current and former Dolphins players, Dolphins coaching staff and front office personnel, and Martin's parents and agent. Wells's group also reviewed emails and text messages between Martin and his teammates and coaches.

Paul, Weiss interviewed Coach Turner twice during the investigation. The first interview occurred in November 2013, with Wells accompanied by two other members of his law firm. Turner did not bring his own attorney to the interview, but a member of the Dolphins' legal staff was present. In December 2013, Wells and a member of his law firm interviewed Turner a second time via teleconference. As was true during the first interview, a member of the Dolphins' legal staff was present. During the three month investigation, Paul, Weiss interviewed more than one hundred witnesses and reviewed thousands of documents.

## D. The Report

On February 14, 2014, Paul, Weiss published its findings in a 144-page report ("the Report"). The Report explained that Martin's teammates subjected him to "persistent harassment," which "contributed to Martin's decision to leave the team." The Report noted that Dolphins coaches and players created a culture

6

that enabled the bullying by discouraging players from "snitching" on other players.  It concluded that "the treatment of Martin and others in the Miami Dolphins organization at times was offensive and unacceptable in any environment, including the world professional football players inhabit."

Five days after Paul, Weiss released its Report, the Dolphins fired Coach Turner.

## II. PROCEDURAL HISTORY

In September 2015, Plaintiff Turner filed his complaint against the Defendants, alleging that the Report defamed him.  The district court interpreted Turner's complaint as advancing three claims of defamation under Florida law: (1) defamation per se, (2) common law defamation based on actual malice, recklessness or negligence, and (3) defamation by implication.  Turner v. Wells, 198 F. Supp. 3d 1355, 1364 (S.D. Fla. 2016).

In October 2015, the Defendants moved to dismiss Plaintiff Turner's complaint, under Federal Rule of Civil Procedure 12(b)(6), arguing that Turner failed to state a claim for defamation or defamation by implication.  The Defendants contended that: (1) the Report consisted of opinions and therefore was not actionable in a defamation suit; (2) Turner's complaint misstated what the Report actually said and failed to identify any false statement of fact in the Report;

and (3) in any event, Turner was a public figure and failed to adequately plead actual malice in his complaint.

In July 2016, the district court entered a comprehensive order granting the Defendants' motion to dismiss.  Turner, 198 F. Supp. 3d at 1355-81.  This is Turner's appeal.

### III. STANDARD OF REVIEW

We review de novo a district court's dismissal of a complaint for failure to state a claim.  Bishop v. Ross Earle & Bonan, P.A., 817 F.3d 1268, 1270 (11th Cir. 2016).

In analyzing Turner's defamation claims, we apply Florida's substantive law.  Horowitch v. Diamond Aircraft Indus., Inc., 645 F.3d 1254, 1257 (11th Cir. 2011).  Where the highest court—in this case, the Florida Supreme Court—has spoken on the topic, we follow its rule.  Molinos Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1348 (11th Cir. 2011).

Where that court has not spoken, however, we must predict how the highest court would decide this case.  Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d 1317, 1326 n.5 (11th Cir. 2005).  Decisions of the intermediate appellate courts—here, the Florida District Courts of Appeal— provide guidance for this prediction.  See Bravo v. United States, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) (citing West v. Am. Tel. & Tel. Co., 311 U.S.

8

223, 237, 61 S. Ct. 179, 183 (1940)).  As a general matter, we must follow the decisions of these intermediate courts.  Id. at 1325-26.  But we may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise.  Id.

We first review Florida law regarding the tort of defamation.  We then apply it to passages in the Report that Turner claims are defamatory.

## IV. FLORIDA LAW

Defamation under Florida law has these five elements: (1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory.  Jews For Jesus, Inc. v. Rapp, 997 So. 2d 1098, 1106 (Fla. 2008).

True statements, statements that are not readily capable of being proven false, and statements of pure opinion are protected from defamation actions by the First Amendment.  Keller v. Miami Herald Publ'g Co., 778 F.2d 711, 714–15, 717 (11th Cir. 1985) (applying Florida law); Blake v. Giustibelli, 182 So. 3d 881, 884 n.1 (Fla. Dist. Ct. App. 2016) ("Statements of pure opinion are not actionable."); Anson v. Paxson Commc'ns Corp., 736 So. 2d 1209, 1211 (Fla. Dist. Ct. App. 1999); Miami Child's World, Inc. v. Sunbeam Television Corp., 669 So. 2d 336, 336 (Fla. Dist. Ct. App. 1996).

9

Under Florida law, a defendant publishes a "pure opinion" when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public. From v. Tallahassee Democrat, Inc., 400 So. 2d 52, 57 (Fla. Dist. Ct. App. 1981). Mixed expression of opinion occurs when an opinion or comment is made which is based upon facts regarding the plaintiff or his conduct that have not been stated in the publication or assumed to exist by the parties to the communication. Id.; Stembridge v. Mintz, 652 So. 2d 444, 446 (Fla. Dist. Ct. App. 1995).

Whether the statement is one of fact or opinion and whether a statement of fact is susceptible to defamatory interpretation are questions of law for the court. Keller, 778 F.2d at 715; Fortson v. Colangelo, 434 F. Supp. 2d 1369, 1379 (S.D. Fla. 2006); From, 400 So. 2d at 56-57. When making this assessment, a court should construe statements in their totality, with attention given to any cautionary terms used by the publisher in qualifying the statement. Keller, 778 F.2d at 717. It is also the court's function to determine "whether an expression of opinion is capable of bearing a defamatory meaning because it may reasonably be understood to imply the assertion of undisclosed facts that justify the expressed opinion about the plaintiff or his conduct." Stembridge, 652 So. 2d at 446 (quoting Restatement (Second) of Torts § 566, comment c).

10

While the Report focused on the Dolphins' players and coaches and the team's overall culture and workplace environment, the Report did make several references to Coach Turner. And Turner's complaint focuses primarily on four specific passages in the Report. He asserts that certain statements in these passages were false, defamed his professional reputation, and cost him his job. We detail what the complaint says about each of the statements in the Report that Turner claims defamed him. As we do so, we evaluate whether the specific statement was defamatory under Florida law. We then turn to Turner's claims of defamation by implication and whether Turner was a public figure.

## V. THE "BLOW-UP" DOLL INCIDENT WITH PLAYER A

The Report not only detailed the abuse that Martin endured, but also gave examples of harassment suffered by other offensive linemen. One player—whom the Report and the complaint anonymized as "Player A" or "Player 1," respectively[1]—was the subject of homophobic taunting. Fellow offensive linemen often referred to Player A using homophobic slurs. Dolphins offensive linemen also accused Player A of performing oral sex on men and would ask Player A "where's your boyfriend?" Player A's peers acknowledged that Player A was not actually believed to be gay but was spoken to repeatedly in this manner and taunted about his supposed homosexuality. One Dolphins lineman acknowledged

---

[1]We refer to this player as "Player A."

11

that Player A was spoken to in this manner "every day from everybody, high frequency."

The Report claimed that Coach Turner "was aware of the running 'joke' that Player A was gay, and on at least one occasion, [Coach Turner] participated in the taunting." The Report explained that, around Christmas 2012, Turner gave each offensive lineman a gift bag. As the Report detailed, all of the gift bags contained female "blow-up dolls" except for one gift bag, which contained a male "blow-up doll." Turner gave this gift bag to Player A. Martin told Paul, Weiss that he was offended that Turner endorsed this humiliating treatment of Player A by participating in it.

According to the Report, when Paul, Weiss asked Coach Turner if he had given a male blow-up doll to Player A, Turner replied "I can't remember." Paul, Weiss found that Turner's response was not credible. Rather, the Report found that numerous persons confirmed, and no one disputed, that this incident occurred.

According to Coach Turner, the Paul, Weiss investigators did not ask him about the male blow-up doll incident during the first interview, but waited until the second, "purposely confrontational and accusatory interview" to broach the subject. When asked about the incident, Turner claims that he questioned its relevance to Martin's decision to leave the team and, in the face of the Paul, Weiss

12

investigators' aggressive tone, dismissed the questions about the male blow-up doll incident as irrelevant and accusatory.

On appeal, Coach Turner does not dispute that he gave the male blow-up doll to Player A. Instead, he takes issue with how the Report categorized his conduct. Turner claims that the gift of a male blow-up doll was a joke—a satirical commentary on male Player A's unsuccessful attempts at dating women. In his complaint, Turner claims that the purpose of his gifts to the offensive linemen was to encourage the players to work on their relationships with their significant others, lest they end up alone, and that the particular gift to Player A "in no way expressed cruelty or homophobia on Turner's part." Turner argues that Paul, Weiss wrongfully concluded that he behaved inappropriately in giving the gift because nearly everyone, including Player A, viewed the gift as a harmless prank.

In his complaint, Coach Turner alleges that three statements within the Report's description of the blow-up doll incident were false and defamatory: (1) the Report's statement that Turner "participated in this behavior [homophobic taunting] of Player A" by giving him the male blow-up doll; (2) the Report's statement that Turner's male blow-up doll gift showed that Turner "endorsed the humiliating treatment of Player A"; and (3) the Report's statement that "Player A regarded the persistent insults . . . as unwelcome." In his complaint, Turner also alleges that Paul, Weiss defamed him by implication by purposefully omitting

13

from the Report the fact that several Dolphins players and one Dolphins coach considered the male blow-up doll to be a harmless "joke," as opposed to homophobic taunting.  Given the Report and allegations in the complaint, we agree with the district court that none of these statements is defamatory.

As to homophobic taunting, the Report outlined the many undisputed facts upon which the Defendants relied in making the challenged statements.  It is not disputed (1) that linemen players engaged in persistent homophobic taunting of Player A, (2) that Turner knew about that taunting, and (3) that Turner gave other linemen a female blow-up doll, but gave Player A, and him alone, a male blow-up doll.

The first statement that Coach Turner challenges—that on at least one occasion he participated in "homophobic taunting" of Player A—is an opinion and not actionable in a defamation suit.  This statement is the Defendants' subjective assessment of Turner's conduct and is not readily capable of being proven true or false.  Michel v. NYP Holdings, Inc., 816 F.3d 686, 697 (11th Cir. 2016) (explaining difference between statements of opinion and statements of fact, noting that statements of fact are "readily capable of being proven true or false").  Turner's argument that another reader might come to a different conclusion upon review of the facts—that the gift was a joke—does not make the Defendants' assessment of Turner's acts anything other than opinion.

14

Notably too, the Report included several cautionary statements that inform a reasonable reader that the conclusions contained therein are opinions. Keller, 778 F.2d at 717. For example, the Report stated several times that it sets forth the Defendants' opinions, based on a lengthy investigation: "[t]he opinions set forth in the findings and conclusions below and elsewhere in this Report are our own"; "[i]n our opinion, the factual record supports the following findings"; "[t]he Report presents the independent opinions of Mr. Wells and his colleagues." Further, it is well settled in Florida that commentary or opinion based on accurate facts set forth in an article "are not the stuff of libel." Rasmussen v. Collier Cty. Publ'g Co., 946 So. 2d 567, 571 (Fla. Dist. Ct. App. 2006); Zambrano v. Devanesan, 484 So. 2d 603, 606 (Fla. Dist. Ct. App. 1986); Hay v. Indep. Newspapers, Inc., 450 So. 2d 293, 295 (Fla. Dist. Ct. App. 1984). That is precisely the case here.

As to the endorsement statement, the Report attributed that statement to Martin. Specifically, Martin told the Defendants that he was surprised Turner made this gesture to Player A and that Martin was offended that Turner "endorsed the humiliating treatment of Player A by participating in it." Turner takes this statement out of context as it is what Martin said about Turner, not what the Defendants said about Turner.

As to the statement that Player A regarded the persistent insults as unwelcome, Turner contends that this statement was false because it misleads the

15

reader into believing that Player A was offended by the male blow-up doll gift, when, according to Turner, he was not.  But Turner also reads this statement out of context.  This statement comes after the Report detailed the repeated and persistent homophobic taunting that Player A's peers subjected him to, and does not clearly pertain to any one incident in particular.  As Paul, Weiss went on to note, "[i]n our view, these incidents cannot be viewed in isolation" but were "part of a pattern of abusive, unprofessional behavior."  In fact, the Report never addressed Player A's reaction to the male blow-up doll gift, instead focusing on the reaction of Martin and how it impacted his decision to leave the team.  Nothing in the Report about Turner, the male blow-up doll, and homophobic taunting is defamatory.

## VI. DEMONSTRATED POOR JUDGMENT IN TEXTING

The Report also concluded that it was inappropriate for Turner to text Martin, an emotionally troubled player, and that Turner "demonstrated poor judgment" in texting.  Once again, the complaint and the Report set forth undisputed facts about Turner's texting Martin.

On November 2, 2013—after Martin had left the Dolphins and begun to receive psychiatric treatment—Coach Turner began to send text messages to Martin concerning the media's coverage of Martin's departure from the team.  Specifically, Turner urged Martin to respond to the media's treatment of Martin's teammate Richie Incognito.  During the 2012 and 2013 seasons, Richie Incognito

16

played alongside Martin as an offensive lineman. The Report categorized Incognito as one of the "veteran leaders" of the Dolphins offensive line who was often the "ringleader" in bullying Martin. At the time Turner sent his text messages, the media were reporting that Martin was the victim of a protracted bullying campaign led by Incognito.

In his texts, Coach Turner encouraged Martin to make a public statement defending Incognito. Martin replied, explaining that he wanted to defend Incognito, but that he was being advised not to put out a statement. Without any replies from Martin, Turner continued to ask Martin to make a statement. The text message conversation is included in its entirety in the Report as follows:

November 2, 2013

Turner:      Richie Incognito is getting hammered on national TV. This is not right. You could put an end to all the rumors with a simple statement. DO THE RIGHT THING. NOW.

Martin:      Coach. I want to put out a statement. Believe me I do. This thing has become a huge story somehow. But I've been advised not to . . . And I'm not supposed to text anyone either cuz last time I responded to a teammate (Richie) I was intentionally manipulated and the conversation was immediately forwarded to a reporter.

Turner:      He is protecting himself. He has been beat up for 4 days. Put an end to this. You are a grown man. Do the right thing.

17

Turner:        John I want the best for you and your health but make a statement and take the heat off Richie and the lockerroom. This isn't right.

November 3, 2013

Turner:        I know you are a man of character. Where is it?

November 6, 2013

Turner:        It is never too late to do the right thing!

After reviewing the context of this text conversation, Paul, Weiss found that Coach Turner "may have believed in good faith that Incognito was being unfairly attacked by the media." But Paul, Weiss opined that Turner "should have realized that it was inappropriate to send such text messages to an emotionally troubled player." Paul, Weiss concluded that the text messages "demonstrated poor judgment on Turner's part."

In his complaint, Coach Turner alleges that Paul, Weiss defamed him by stating that his text messages were inappropriate and that he demonstrated poor judgment. But for the same reasons discussed in the blow-up doll analysis, we hold that the Defendants' conclusions of "inappropriate" and "poor judgment" are pure opinion and nonactionable.

In so concluding, we consider the full context in which these text messages were sent.

18

Coach Turner undisputedly knew that Martin was emotionally troubled at the time he left the team, had hospitalized himself, and had struggled with mental health problems. Martin even responded to Turner's first text telling Turner that Martin had been advised not to issue a statement. Nonetheless, Turner continued to text Martin three more times, pressuring and arguably berating him to be a "man of character" and "do the right thing." We have no trouble concluding that the Report's characterization of Turner's conduct in this regard was nonactionable.

## VII. TURNER DID NOT STOP INSULTING COMMENTS

Martin's teammates subjected him to verbal taunts and made disparaging remarks about members of his family. These remarks included sexually crude references to Martin's sister (a medical student) and mother. Martin told the Paul, Weiss investigators that he was "particularly offended" by these comments but that his obvious discomfort only increased the frequency and intensity of the remarks.

According to the Report, Martin heard the insults about his sister "throughout the Dolphins training facility—in the locker room, on the practice field, in the showers, in the offensive line room (often before meetings got started), even sometimes in the cafeteria." As also noted in the Report, Martin told the Paul, Weiss investigators that his teammates often made these comments "in the presence of Coach Turner, who neither participated nor urged [Martin's] teammates to stop."

19

In his complaint, Turner alleges that the Defendants defamed him by including these two statements in the Report: (1) that Turner was "certainly aware of some of the insulting comments directed to Martin" and (2) that "it [was] undisputed that [Turner] never sought to stop the behavior."[2]

We readily reject Turner's claim that the Report falsely defamed him by stating that he was present when offensive linemen subjected Martin to insults but failed to stop the abuse directed to Martin. First, the Report made clear that Turner was aware of only "some of the insulting comments directed to Martin." Even Coach Turner appears to have indicated to the district court that he was in fact aware of some of the disparaging comments directed towards Martin. Turner acknowledges this again on appeal, arguing that "to the extent Turner was aware of any comments directed at Martin, such comments were typical locker-room banter among players and no different from what occurs in every NFL locker room."

As to this claim, Turner also cherry picks statements in the Report out of context. A fuller picture of what the Defendants wrote in the Report exemplifies how careful and balanced the Report was. The Report stated:

> Martin claimed that both of his offensive line coaches, Turner and Mosley, overheard some of the raunchy comments about his sister . . . According to both Martin and Incognito, Turner neither

_____

[2]In his complaint, Coach Turner also alleges that Paul, Weiss defamed him by implication in this passage by omitting from the Report whether the insults traded among the Dolphins offensive linemen were common among NFL players on other teams.

20

joined nor criticized the harsh language.  Also, both Martin and Incognito said they thought Turner was a good coach.

. . . Ultimately, however, both Martin and Incognito agreed that the bulk of the insulting comments were not made in front of Turner and Mosley, and both players were uncertain to what extent their coaches truly appreciated the nature of the conduct at issue.

Based on the entire record, we find that Coaches Turner and Mosley were certainly aware of some of the insulting comments directed to Martin by Incognito, Jerry[,] and Pouncey, although we cannot determine the full extent of that awareness and whether they had any appreciation of how hurtful this language was to Martin. It is undisputed that these coaches never sought to stop the behavior.

Indeed, Coach Turner does not argue that he was never present when Martin was subjected to the insulting comments nor does he identify any action he took to stop them.  The challenged statements are true, and Turner's defamation claim falls short on this basis alone.  Hallmark Builders, Inc. v. Gaylord Broad. Co., 733 F.2d 1461, 1464 (11th Cir. 1984) (under Florida law, "[a] false statement of fact is the sine qua non for recovery in a defamation action." (quoting Byrd v. Hustler Magazine, Inc., 433 So. 2d 593, 595 (Fla. Dist. Ct. App. 1983)).  Furthermore, whether these types of insults occur routinely—as Turner alleges—in other NFL locker rooms does not render false that Turner heard some of these comments here and never sought to stop the behavior.

## VIII. THE EXISTENCE OF A "JUDAS CODE"

In his complaint, Coach Turner accused Paul, Weiss of defaming him in its discussion of the existence of the "Judas Code" and the fine system for snitches.

21

We recount the facts about the "Judas Code" and the fine system that Paul, Weiss reported and how that contributed to Martin's reluctance to report the bullying and taunting.  The Report found, and it is undisputed, that Martin never reported the abuse he suffered to the Dolphins organization.  The question is why.

As the Report explained, Martin believed that there was a general code in football against "snitching" on fellow players, preventing him from disclosing the bullying to his superiors.  The Report noted that the Dolphins offensive linemen enforced the general code against snitching through an internal fine system.  The NFL allows players to establish fine systems under certain conditions, including the rule that any money collected must be put to a common, team-oriented purpose, like a post-season party.

At the start of the 2013 season, the Dolphins offensive linemen created such a fine system and began to impose fines for trivial infractions such as being late to meetings or wearing "ugly" shoes.  The players also imposed fines for "acting like a 'Judas,'" which meant being a traitor or a snitch.  As the Report explained, "if Coach Turner, while watching game film footage, criticized a lineman for missing an assignment, and that lineman pointed out that one of his teammates was actually at fault, that lineman might be labeled a 'Judas,' which could result in a fellow player imposing a fine."

Paul, Weiss reported that several offensive linemen understood the "Judas" rule and had told the investigators that Coach Turner previously discussed the "Judas" concept with them. The Report noted that a former Dolphins coach credited Turner with introducing the "Judas" concept to the Dolphins offensive linemen. The Report, however, pointed out that Turner (1) denied ever hearing the term "Judas fine," or references to "Judas," in the offensive line room, (2) denied lecturing the offensive linemen on the meaning of the term "Judas," and (3) denied even knowing what the term "Judas" meant in the context of the Dolphins offensive line.

The Report did not credit Coach Turner's denials and stated "[t]he evidence show[ed], however, that Turner was aware of the 'Judas' concept and . . . that he [had] discussed its meaning with a number of linemen, even explaining how the biblical Judas had betrayed Jesus Christ and so became a 'snitch.'" Ultimately, the Report stated:

> We accept that the fear of being labeled a "snitch" or a "Judas" played a role in Martin's decision not to report abuse from his teammates. Martin believed that going to his coaches or other authority figures meant risking ostracism or even retaliation from his fellow linemen.

In the district court, Coach Turner contended that the "Judas Code" did not exist and that the Report defamed him by falsely accusing him of establishing a "Judas Code" and enforcing the code through a fine system. But Turner admits

23

that he "occasionally used the term 'Judas' to describe situations in which one of his players transferred responsibility for an on-field error to another player." More importantly, as the district court correctly noted, the Report never stated that Turner established a fine system enforcing the "Judas Code." Turner, 198 F. Supp. 3d at 1373-74. Instead, the Report expressly stated that the Dolphins offensive linemen established and enforced the fine system on each other for a variety of offenses (being late to a meeting, wearing ugly shoes, not providing candy) and for acting like a snitch or "Judas."

As the district court also observed, Coach Turner's claim was contradicted by Martin's statement in the Report that the "Judas fines" deterred him from telling his superiors of his bullying and therefore "snitching." Turner does not dispute that is what Martin told the investigators.

We hold that this claim fails as a matter of law for the reasons stated by the district court. There is no false statement of fact here to support a defamation claim. Turner, 198 F. Supp. 3d at 1373; see also Hallmark Builders, Inc., 733 F.2d at 1464; Byrd, 433 So. 2d at 595.[3]

_____

[3]On appeal, Coach Turner argues (1) that the Report did not reflect the Defendants' "genuine interpretation of the facts"; (2) that the Defendants published the prearranged and "paid-for" conclusions of the NFL; and (3) that the district court therefore erred in finding that the Report consisted of the Defendants' nonactionable opinions. While Turner concedes that a speaker's "pure opinion" is generally protected from a claim for defamation, he argues that an opinion that is not the speaker's own opinion is excepted from this rule.

24

## IX. DEFAMATION BY IMPLICATION

Even if none of the Report's statements themselves are defamatory, Coach Turner's complaint alleges that the Defendants' artful drafting in the Report purposefully omitted certain facts and juxtaposed other irrelevant facts, thereby suggesting that Turner personally fostered a culture of bullying within the Dolphins offensive line.

### A. Applicable Law

Whether the defendant's statements constitute defamation by implication is a question law for the court to determine. Brown v. Tallahassee Democrat, Inc., 440 So. 2d 588, 590 (Fla. Dist. Ct. App. 1983); see also Hallmark Builders, Inc., 733 F.2d at 1464 ("A trial court . . . is not precluded from finding, as a matter of law, that a publication is not defamatory."). The inquiry turns on whether the "gist" of the publication is false. Jews For Jesus, Inc., 997 So. 2d at 1107-08 (explaining that liability attaches to a defendant who has the details right but the "gist" wrong). Whether the publication is defamatory becomes an issue of fact for the jury only where the publication is susceptible of two reasonable interpretations, one of which

---

We disagree that there is such an exception under Florida law. For one, Turner fails to cite any legal authority for this position, and we have found none. We therefore find no basis to predict that the Florida Supreme Court would adopt Turner's proposed exception to the "pure opinion" doctrine. Second, Turner's proposed exception does not center on the required falsity element but on an element he invents wholecloth—genuineness. What Turner's argument ignores is that adopting and publishing another's opinion does not, by itself, make that opinion false.

is defamatory.  Hallmark Builders, Inc., 733 FF.2d at 1464; Miami Herald Publ'g Co. v. Ane, 423 So. 2d 376, 389 (Fla. Dist. Ct. App. 1982).

But even if the statements are defamatory by implication, a defendant is still protected from suit if his statements qualify as an opinion: "[s]imply put, 'if the defendant juxtaposes a series of facts so as to imply a defamatory connection between them, or creates a defamatory implication by omitting facts, he may be held responsible for the defamatory implication, unless it qualifies as an opinion, even though the particular facts are correct.'"  Jews For Jesus, Inc., 997 So. 2d at 1108 (emphasis added) (quoting W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 116, at 117 (5th ed. Supp. 1988)).

With this precedent as guidance, we address Turner's defamation by implication claims.

## B.  Defamation by Implication Claims

Coach Turner's first claim—that the Report implied a connection between his use of the term "Judas" to the establishment of a "Judas Code" fine system— fails in light of the express words in the Report, which assigned responsibility for the fining system to the offensive linemen: "[a]round the beginning of the 2013 season, the Dolphins offensive linemen established such a system, and began to impose fines on each other for a variety of trivial offenses" and "for acting like a 'Judas,' meaning a traitor or 'snitch.'"  According to Turner, the Report also

26

falsely implied that he played a role in Martin's emotional struggles and his decision to leave the team.  Like the district court, we are "hard-pressed to discern what arguably defamatory statement could reasonably follow from the facts about the fine system or the 'Judas' concept" when considering the Report's actual text. Turner, 198 F. Supp. 3d at 1376.  We agree with the district court that "[n]o reasonable person's perception of the entirety of this discussion would be that the Defendants defamed Turner by juxtaposing facts."  Id.

Second, Coach Turner argues that the Report falsely accused him of homophobic taunting.  He argues that Paul, Weiss defamed him by implication by omitting from the Report the fact that several Dolphins players—including Player A—and one Dolphins coach, considered the male blow-up doll gift to be a harmless joke.  Turner also contends that Paul, Weiss implied that Turner participated in the homophobic taunting of Player A by placing the discussion of the male blow-up doll gift within the section concerning the homophobic taunting of Player A.

This claim fails because the Report's conclusion that Coach Turner engaged in homophobic taunting is a nonactionable opinion.  To reiterate, the Defendants' classification of Turner's gift—a male blow-up doll given to a player taunted for his supposed sexual orientation—as homophobic taunting is subjective and not readily capable of being proven true or false.

27

Third, Coach Turner argues that the Defendants defamed him by omitting from the Report a comparison of the Dolphins locker room to that of other NFL teams and the fact that the type of insults traded among the Dolphins offensive linemen were common among NFL players on other teams, especially in locker rooms. As the district court did, we hold that this argument fails in deference to the Defendants' editorial discretion in what to publish in their Report. Perk v. Reader's Digest Ass'n, 931 F.2d 408, 412 (6th Cir. 1991) ("[Publishers] have no legal obligation to present a balanced view of what led up to [the publicized event]."); Janklow v. Newsweek, Inc., 759 F.2d 644, 648 (8th Cir. 1985) (concluding that Newsweek was not liable for omission of additional facts where the omission did not make what was published untrue). As the district court rightfully explained, "[t]he law of defamation is concerned with whether a publisher reports a story truthfully, not generously." Turner, 198 F. Supp. 3d at 1371.

Additionally, this omission fails to support a claim of defamation by implication under Florida law because it is irrelevant to the focus of the Report, which was to assess the culture of the Dolphins. Hallmark Builders, Inc., 733 F.3d at 1463 (upholding district court's finding of no defamation after news broadcast failed to compare plaintiff with other area builders and did not mention that plaintiff was not the only home builder under investigation). Accounts of the

28

environment in other teams' locker rooms, which the Defendants chose not to include, would not prove or disprove the Defendants' opinion that Turner acted inappropriately and demonstrated poor judgment.

We also reject Turner's argument that a different set of rules applies to this Report because it involved a commercial setting in a private workplace and not a report by a media organization. The First Amendment protects both media ("freedom . . . of the press") and non-media ("freedom of speech") defendants. U.S. Const. amend. I. Like media defendants, non-media defendants may then choose the true facts to include in their publication. Turner lacks support for his different-rules argument.

Finally, we reject Coach Turner's defamation by implication claim concerning the Report's description of his text messages to Martin. Turner argues that, by failing to note that Martin and Incognito were close friends, and by burying the factual context of Turner's conduct, the Defendants created a false impression about why Turner reached out to Martin. Turner argues that if the Report explained that Martin and Incognito were friends, then Turner's text messages would have reflected Turner's concern for Incognito's treatment in the media, not poor judgment. This argument fails, as the Report noted multiple times that Incognito and Martin were considered by many to be friends, despite

29

Incognito's bullying of Martin.[4]  And any argument that the text messages were taken out of context—making Turner appear callous to Martin's troubles—also fails, because the Report included the text conversation in its entirety, as Turner concedes.  Further, as explained above, the "poor judgment" statement is pure opinion in any event.

## X. TURNER AS A PUBLIC FIGURE

We also affirm the district court's dismissal order for one additional reason not reached by the district court.  Seminole Tribe of Fla. v. Fla. Dep't of Revenue, 750 F.3d 1238, 1242 (11th Cir. 2014) ("[W]e may affirm the dismissal of a complaint on any ground supported by the record even if that ground was not considered by the district court.").  Because Coach Turner is a public figure who has failed to adequately plead that the Defendants acted with malice in drafting and publishing the Report, his complaint was properly dismissed.

## A.  Public Figure

We have little difficulty predicting that Coach Turner would be considered a public figure under Florida law.  Mile Marker, Inc. v. Petersen Publ'g, L.L.C., 811 So. 2d 841, 845 (Fla. Dist. Ct. App. 2002) (stating that public figure status "is a

---

[4]The Report discussed Martin and Incognito's "odd but seemingly close friendship." (Report at 7-8; see also id. at 23 ("curious but seemingly close friendship"), 34 ("unique friendship"), 40-42 (section titled "Martin's Friendship with Incognito Does Not Excuse the Abuse"), 93-95 (section titled "The Friendship Between Martin and Incognito" ), 102 ("the closeness of [Incognito's] friendship with Martin"), 123-25 (section titled "The Continuation of the Friendship between Martin and Incognito")).

question of law to be determined by the court") (quoting Saro Corp. v. Waterman Broad. Corp., 595 So. 2d 87, 89 (Fla. Dist. Ct. App. 1992)).

For one, Florida courts have found public figure status in circumstances similar to this one. In Scholz v. RDV Sports, Inc., Florida's Fifth District Court of Appeal found that there was "ample record support" for the trial court's conclusion that the plaintiff was a public figure, because he was an assistant professional basketball coach who previously had been a successful college basketball coach. 710 So. 2d 618, 626 (Fla. Dist. Ct. App. 1998). The Scholz court also noted that he "drew public attention to himself and his employment status with the [professional team] when he met with newspaper reporters at his lawyer's office immediately after he filed his lawsuit against the [professional team]." Id.

This holding compares well with the precedent of other jurisdictions, who generally consider coaches of professional and collegiate sports teams to be public figures. Curtis Publ'g Co. v. Butts, 388 U.S. 130, 154-55, 87 S. Ct. 1975, 1991 (1967) (college football coach and athletic director); Marcone v. Penthouse Int'l Magazine For Men, 754 F.2d 1072, 1083 (3d Cir. 1985) ("[S]ports figures are generally considered public figures because of their position as athletes or coaches."); Brewer v. Memphis Publ'g Co., 626 F.2d 1238, 1254-55 (5th Cir. 1980) (former college and professional football player); Time, Inc. v. Johnston, 448 F.2d 378, 380 (4th Cir. 1971) (former professional basketball player and

current college assistant coach); Vandenburg v. Newsweek, Inc., 441 F.2d 378,

379 (5th Cir. 1971) (college track coach).

Here, Coach Turner chose to put himself in the public arena. As the Report

noted, Turner was the focus of the 2012 season of Hard Knocks, an HBO

television program that "showcase[ed] Turner's coaching style and featur[ed]

interviews and footage of him on the field and in the locker room."[5] During his

coaching career, Turner was the subject of several articles discussing his career and

coaching philosophy. Turner was a prominent person on the closely followed

Dolphins professional sports team.

Moreover, after the Defendants finished their investigation, Turner took

advantage of his familiarity with the media by commissioning a response to the

Report, which included Turner giving his conclusions as to why Martin left the

team. See, e.g., Silvester v. Am. Broad. Cos., Inc., 839 F.2d 1491, 1494-97 (11th

Cir. 1988) (finding the defendants to be public figures because they "had ready

access to the media for many years prior to the 1979 broadcast and they voluntarily

placed themselves in a position and acted in a manner which invited public

---

[5]In determining Coach Turner's public figure status, we take judicial notice of the existence of videos produced or articles written about Coach Turner that were filed by the Defendants. We do not, however, consider them for the truth of the matters they assert. U.S. ex rel. Osheroff v. Humana, Inc., 776 F.3d 805, 815 n.4 (11th Cir. 2015) (explaining that courts may take judicial notice of documents such as newspaper articles for a limited purpose, but not for determining the truth of those statements).

scrutiny and comment"); <u>Mile Marker, Inc.</u>, 811 So. 2d at 846 ("[T]he level of media access enjoyed by a particular claimant should be considered as part of the public figure calculus."); <u>Friedgood v. Peters Publ'g Co.</u>, 521 So. 2d 236, 240-41 (Fla. Dist. Ct. App. 1988) (concluding that defamation plaintiff was a public figure because she played a prominent role in the case and the attendant public controversy).

## B. General or Limited

But our inquiry does not end here. Next, we must decide which type of public figure Coach Turner is, "general" or "limited." <u>Saro Corp.</u>, 595 So. 2d at 89. General public figures are individuals who, by reason of fame or notoriety in a community, will in all cases be required to prove actual malice. <u>Id.</u> Limited public figures, on the other hand, are individuals who have thrust themselves forward in a particular public controversy and are therefore required to prove actual malice only in regard to certain issues. <u>Id.</u> (citing <u>Gertz v. Robert Welch, Inc.</u>, 418 U.S. 323, 94 S. Ct. 2997(1974)).

If the existence of a public controversy is established, as it is here,[6] the court must apply a two-part test to determine if a specific individual is a limited public figure for the purpose of that controversy. First, the court must determine whether the individual played a central role in the controversy. <u>Friedgood</u>, 521 So. 2d at

---

[6]Coach Turner conceded to the district court that the Report and the "bullying scandal" it concerned amounted to a public controversy. We agree.

33

239 (citing <u>Gertz</u>, 418 U.S. at 347, 94 S. Ct. at 3010).  Second, it must determine whether the alleged defamation was germane to the individual's role in the controversy.  <u>Id.</u>; <u>see also</u> <u>Saro Corp.</u>, 595 So. 2d at 89.

We disagree with Coach Turner's contention that he cannot be considered a limited public figure because he did not attempt to influence this public controversy.  When Turner took the job as the offensive line coach for the Dolphins NFL team, he thrust himself into the public limelight inherent in professional sports and well within the public controversy arising from Martin's bullying.  Even if Turner's players were mainly responsible for the bullying, and therefore the scandal, this does not prevent Turner from becoming a public figure.  <u>Friedgood</u>, 521 So. 2d at 239 ("[I]t may be possible for someone to become a public figure through no purposeful action of their own.").  Furthermore, Turner's text messages to Martin—pushing him to make a statement to the press defending Incognito—and his commissioning a response to the Report show that Turner inserted himself into the controversy even after it had made national news.  Turner also agreed to be interviewed by the Defendants, becoming a central figure in the Report.

## C. Malice

Because Coach Turner is a public figure, he must establish "actual malice" on behalf of the author or publisher in order to maintain a defamation action.

Nodar v. Galbreath, 462 So. 2d 803, 806 (Fla. 1984) (citing New York Times Co.
v. Sullivan, 376 U.S. 254, 280, 84 S. Ct. 710, 726 (1964)).  This Court held
previously that the Twombly/Iqbal "plausibility pleading standard applies to the
actual malice standard in defamation proceedings."  Michel, 816 F.3d at 702.
Thus, to plead actual malice, Turner "must allege facts sufficient to give rise to a
reasonable inference that the false statement was made 'with knowledge that it was
false or with reckless disregard of whether it was false or not.'"  Id. (quoting
Sullivan, 376 U.S. at 280, 84 S. Ct. at 726).  This is a subjective test, focusing on
whether the defendant "actually entertained serious doubts as to the veracity of the
published account, or was highly aware that the account was probably false."  Id. at
702-03.

Coach Turner's complaint alleges malice, but most of his allegations are set
forth in a conclusory manner.  Throughout his complaint, Turner alleges that the
Defendants "knowingly and recklessly" ignored or deliberately avoided learning
information when drafting their Report, but the complaint does not set forth facts
demonstrating that the Defendants acted in these ways.  Those portions of the
complaint do not allege sufficient relevant facts to support a claim of actual malice.
Id. at 703-04.

Coach Turner does allege, however, that the Defendants were aware of
certain information that would have portrayed him in a better light, but

35

purposefully decided to omit it in order to comply with the NFL's prearranged conclusions. But curiously, most of the examples given by Turner are actually included in the Report: Martin and Incognito's relationship, Martin's participation in making crude remarks about other teammates, Martin's displeasure with football as an additional motivation for leaving the team, that Turner's players thought well of him, and that Turner did not establish the fine system for players acting as a "Judas" or snitch. And most of this information cuts against the Defendants' general conclusions, allowing readers to decide for themselves what to conclude from the Report, making any allegation of actual malice less plausible. Id. at 703 ("[R]eporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice.").

Some of the other information—such as comparisons to the locker rooms of other NFL teams or how other Dolphins players viewed the male blow-up doll gift—is simply irrelevant to the focus of the Report, which concerned Martin's reaction to his experience as a Dolphins player.

Ultimately, many of Coach Turner's allegations center on the Defendants' failure to properly analyze certain information. But these allegations also fail to allege malice, because they do not give rise to a reasonable inference that the Defendants knowingly or with reckless disregard published a false statement of fact. If anything, these allegations attack the reliability of the Defendants'

36

opinions, and we have explained above why these types of claims fall outside the scope of a defamation suit.

We therefore affirm the district court's ruling on this additional ground as well.

## XI.  CONCLUSION

For all of the above reasons, we affirm the district court's dismissal of Turner's complaint.

**AFFIRMED.**