MARCIA G. COOKE, United States District Judge
THIS MATTER is before me on the Motion for Summary Judgment (ECF No. 138 ) filed by Defendants Guy Lawson, Alexander Podrizki, David Packouz, Simon & Schuster, Inc. ("S & S") and Recorded *1149 Books, Inc. Defendants' motion is fully briefed and ripe for review. For the reasons set forth herein, the motion is granted.
I. BACKGROUND
Plaintiff Shkelzen Berisha is the son of Sali Berisha, the former Prime Minister (and before that the President) of Albania. Defs.' Stmt. of Facts , ECF No. 139 ("DSOF "), at ¶ 3. In this defamation action, Plaintiff challenges statements made about him by Defendant Lawson, principally in Lawson's book entitled "Arms & The Dudes: How Three Stoners from Miami Beach Became the Most Unlikely Gunrunners in History," published by Defendant S & S in June 2015. Id. at ¶ 1. The book tells the "unlikely" story of Efraim Diveroli,[1] Defendant Packouz and Defendant Podrizki, Florida residents and childhood friends who became international arms dealers.[2] Id. at ¶ 2. The challenged statements are all to the effect that Plaintiff was involved in corrupt arms dealing, and that he was affiliated with the Albanian mafia. Id. at ¶ 3.
A. The Albanian Deal and Its Aftermath
In 2005, Defendant Packouz began working for AEY, Inc., a company run by his childhood friend Diveroli. DSOF at ¶ 4. AEY made its money by bidding on and satisfying arms procurement contracts posted online by the United States military. Id. In 2006, AEY won a contract to provide equipment to the Afghan military, a deal worth approximately $ 300 million. Id. at ¶¶ 5-6. The largest component of the deal was the delivery of 100 million rounds of AK-47 ammunition to Afghanistan. Id. at ¶ 7.
Using a middleman, AEY found a trove of the required ammunition in Albania, at what appeared to be a bargain price. Id. at ¶ 8. AEY's plan was for its middleman to use a shell company to buy the ammunition from Albania's Military Export Import Company ("MEICO"), a state-owned company tasked with disposing of the immense stockpiles of weapons left over from the Cold War. Id. at ¶¶ 9, 12. The middleman would then sell the ammunition to AEY. Id. at ¶ 9. Realizing that AEY needed someone "on the ground" in Albania, Packouz enlisted another childhood friend, Defendant Podrizki. Id. at ¶ 10. Packouz chose Podrizki because of the latter's familiarity with firearms and, evidently, with illicit trafficking. Id. ; Pl.'s Stmt. of Facts , ECF No. 154 ("PSOF "), at ¶ 10.
Podrizki traveled to Albania and met Ylli Pinari, the head of MEICO. DSOF at ¶ 11. Pinari showed the supply of Cold War-era ammunition to Podrizki, who determined that it was of good quality despite its age. Id. at ¶ 12. However, Podrizki noticed that some of the ammunition's packaging bore Chinese markings, a potential deal-breaker given that there was an embargo barring American companies from selling Chinese-made ammunition. Id. at ¶ 13. Podrizki told Packouz about the markings, but AEY decided to try to conceal the ammunition's Chinese origin and ship it in contravention of the embargo. Id.
To that end, Podrizki engaged an Albanian businessman, Kosta Trebicka, to remove *1150 the ammunition from its original packaging and place it into nondescript plastic bags and cardboard boxes. Id. at ¶ 14. Once on the job, Trebicka discovered that AEY's middleman was selling the ammunition to AEY at nearly double the price he was paying to MEICO. Id. at ¶ 15. Packouz speculated that the price differential was being funneled into "kickbacks" for Albanian officials, perhaps including Pinari. Id. at ¶ 16.
In May 2007, Diveroli learned about the situation and flew to Albania to negotiate directly with MEICO. Id. at ¶ 17. Diveroli and Podrizki met with Pinari in Tirana, the Albanian capital. Id. at ¶ 18. They also met[3] with Pinari's business associate, Mihail Delijorgji, and another individual, about the same age as Podrizki, who remained silent and was not introduced. Id. at ¶¶ 19-22. Diveroli was informed that AEY could have a price reduction on the ammunition if the contract for the repackaging was taken away from Trebicka and given to a company controlled by Delijorgji. Id. at ¶ 20. Later, Diveroli and Trebicka told Podrizki that the silent, unidentified man at the meeting was the son of the Albanian Prime Minister. Id. at ¶ 23.
Per the new arrangement reached at the meeting, Delijorgji's company was given the repackaging deal. Id. at ¶ 24. Trebicka, having been cut out, started communicating with journalists, including at the New York Times , in an effort to expose those involved in the AEY deal. Id. at ¶¶ 24-25. In an effort to collect incriminating evidence, Trebicka recorded one of his telephone calls with Diveroli. Id. at ¶ 26. During that recorded call, Diveroli told Trebicka that he could not bring him back into the deal because the corruption surrounding it "went up higher to the prime minister and his son." Id. at ¶ 27. "I can't fight this mafia," Diveroli told Trebicka, adding: "It got too big. The animals just got out of control." Id.
On August 23, 2007, AEY's office in Miami Beach was raided by federal investigators. Id. at ¶ 28. Throughout the ensuing investigation, both Packouz and Podrizki cooperated with law enforcement. Id. at ¶ 29. Diveroli, Packouz and Podrizki were all ultimately indicted and entered guilty pleas. Id. at ¶¶ 42-43. Packouz and Podrizki were sentenced to house arrest, while Diveroli received a four-year prison sentence. Id. at ¶ 44.
B. The Gerdec Explosion
On March 15, 2008, a factory where workers were dismantling ammunition for scrap exploded in the Albanian town of Gerdec. DSOF at ¶ 30. The explosion killed 26 people and injured hundreds of others. Id. The Gerdec disaster, dubbed a "Political Hiroshima" by the local press, grew into a major scandal. Id. at ¶ 114. It led to the arrests and convictions of MEICO chief Pinari and his associate Delijorgji, who were found to have been involved in the corrupt dealings that resulted in stockpiles of heavy munitions being dismantled by untrained civilians in the middle of a residential area. Id. at ¶ 31; Ex. 8 to Lawson Decl. News reports suggested that both Plaintiff and the Albanian Defense Minister were involved as well, but neither individual was prosecuted. DSOF at ¶ 32.
C. The New York Times Articles
On March 27, 2008, while AEY was still in business, the New York Times published a front-page article about the company under the headline "Supplier Under Scrutiny *1151 on Arms for Afghans." DSOF at ¶ 34; Ex. 2 to Lawson Decl. , ECF No. 126-2, at p. 1. Quoting the recording that Trebicka had made of Diveroli, including the latter's statement that "the prime minister and his son" were involved in "mafia" dealings, the article stated that the "secretly recorded" conversation "suggested corruption" in AEY's Albanian deal. Ex. 2 to Lawson Decl. , ECF No. 126-2, at pp. 2, 12.
Plaintiff was aware of the Times article shortly after it was published, but never sued the Times or asked it to issue a correction. DSOF at ¶¶ 38-39. To this day, the article remains available in its original form. Id. at ¶ 40.
On October 8, 2008, the Times reported that Trebicka had been "found dead ... on a rural roadside near his car." Ex. 6 to Lawson Decl. , ECF No. 126-6, at p. 2. The article noted that Trebicka had been a witness in the investigation into the Gerdec explosion and, while the police had ruled his cause of death to be a car crash, that finding was being "strongly questioned" by the Albanian media, with some suspecting a "more sinister" cause. Id. Paraphrasing the contents of Trebicka's recorded call with Diveroli, the article stated that "Mr. Diveroli [had] said the corruption went all the way up to the Albanian prime minister, Sali Berisha, and his son." Id. at p. 4.
D. Lawson's Rolling Stone Article
On March 16, 2011, Rolling Stone magazine published an article about AEY written by Defendant Lawson, an investigative journalist. DSOF at ¶¶ 45-46. The article was entitled "Arms & The Dudes: How Two Stoner Kids from Miami Beach Became Big-Time Arms Dealers-Until the Pentagon Turned on Them." Id. at ¶ 46. In researching the article, Lawson relied on court records, news articles and information and documents that he had obtained from Packouz. Id. at ¶ 47. Lawson has stated that he found Packouz to be "smart, credible and reliable." Id. Rolling Stone subjected Lawson's article to fact-checking prior to publication. Id. at ¶ 48.
Lawson's article reported that AEY's Albanian deal had been structured to pay kickbacks to local officials, and it quoted the now-familiar recorded call in which Diveroli had stated that the corruption in Albania "went up higher, to the prime minister and his son." Id. at ¶ 49. The article also reported that the deal to repackage the ammunition had been taken away from Trebicka so that it could be given to Mihail Delijorgji, "a friend of the prime minister's son." Id. at ¶ 50.
Lawson's article received a "huge" amount of attention and was nominated for the 2012 Best Feature Prize awarded by the American Society of Magazine Editors. Id. at ¶ 51. As with the original New York Times article, Plaintiff was aware of the Rolling Stone article around the time it was published. Id. at ¶ 52. Plaintiff claims that he sent Lawson and his Rolling Stone editor an email in response to the article, but Lawson denies having received it, and no such email has been produced in this action. Id. at ¶ 53-56; PSOF at ¶ 74. As with the Times article, the Rolling Stone article is still available in its original form. DSOF at ¶ 53.
E. Additional Reporting on AEY, Gerdec and Plaintiff
In addition to the New York Times and Rolling Stone articles discussed above, the events and allegations at issue in this case were reported on by various media sources over the course of several years.
On February 5, 2009, the Broward Palm Beach New Times published an article discussing Trebicka's "mysterious[ ]" death, noting that "Trebicka had recorded a tape *1152 ... in which Diveroli said corruption in [Albania] 'went up ... to the prime minister and his son.' " DSOF at ¶ 86; Ex. 7 to Lawson Decl. , ECF No. 126-7, at p. 2. This article is still available in its original form. DSOF at ¶ 87.
In May 2009, a book entitled "The Gerdec Disaster: Its Causes, Culprits, and Victims," by Ardian Klosi, was published in Albania. Ex. 10 to Lawson Decl. , ECF No. 126-10, at pp. 6-7. Klosi wrote in the book that "the prime minister's son" had reportedly been present at an arms-dealing meeting with Pinari and Delijorgji. Id. at p. 89.
In 2010, Al Jazeera broadcast a half-hour investigative report about the Gerdec explosion, called "Bullets and Bucks." DSOF at ¶ 88; Ex. 8 to Lawson Decl.[4] The report sought to answer the question: "Why was a dangerous ammunition facility ever sited in the middle of a residential area?" Ex. 8 to Lawson Decl. The answer, it said, lay in a "corrupt scheme" in the "murky depths of Albanian politics." Id. The report stated that "the Prime Minister's son"- Plaintiff-"was allegedly involved with the company behind the Gerdec factory right from the start." Id. The report featured debates from the floor of the Albanian parliament, with legislators demanding to know the identity of the mysterious "Shkelzen" referred to documents related to the Gerdec project. Id. It also tied the disaster to the AEY affair, stating that those who were "behind the scenes at Gerdec" were "the same people" allegedly "involved in the [AEY] scam." Id. Finally, the report stated that despite these allegations Plaintiff had not been questioned by investigators, something for which the Gerdec inquiry had been "widely criticized." Id.
In his deposition, Plaintiff acknowledged that the Al Jazeera report was "damaging." DSOF at ¶ 90. Plaintiff states that he "informed Al Jazeera of the falsity of [the report's] allegations," but that he did not file suit "in deference to his father's wishes." PSOF at ¶ 91. The report remains online to this day. DSOF at ¶ 91.
In 2011, a book entitled "The Shadow World: Inside the Global Arms Trade," by Andrew Feinstein, was published in the United States. Ex. 15 to Lawson Decl. , ECF No. 126-16, at pp. 3-4. In his discussion of AEY's Albanian deal, Feinstein wrote: "Importantly, the son of Sali Berisha, the Prime Minister, was alleged to have been involved in at least one meeting with Delijorgji and Pinari, leading to speculation that he too was in on the deal." Id. at p. 10.
Also in 2011, classified cables written by John Withers, the former U.S. Ambassador to Albania, were disseminated by WikiLeaks. Id. at ¶ 92. In one cable, Ambassador Withers reported that the former head of the Albanian army had approached him out of fear for his safety, stating that Plaintiff had put him under "direct pressure" to continue delivering "high caliber ammunition to Gerdec and to do so without delay." Id. The army chief later denied making those statements. PSOF at ¶ 92. In a second cable, Ambassador Withers noted that Albanian news organizations had been reporting on evidence, leaked from the Gerdec investigation, that implicated Plaintiff in corrupt arms dealing. DSOF at ¶ 93.
On October 29, 2012, the New Republic published an article repeating the original New York Times reporting that, "[i]n 2008, on a secretly recorded phone call, an American arms dealer [had] complained that his scheme to sell illegal ammo from *1153 Albanian junkyards to the U.S. Army had become entangled in an Albanian 'mafia' involving Berisha and his son." Id. at ¶ 97; Ex. 16 to Lawson Decl. , ECF No. 126-17, at p. 6. The article was never corrected and is still available. DSOF at ¶ 98.
Plaintiff has made other news in Albania as well. Local media have reported that he was involved in corruption related to an energy utility company and the country's lottery. Id. at ¶ 115. Plaintiff receives attention through his relationship with Armina Mevlani, a former Miss World contestant with approximately one million social media followers. Id. at ¶ 121; Ex. 68 to McNamara Decl. , ECF No. 140, at p. 41. Plaintiff maintains an email list of Albanian journalists, to whom he sends comments about their reporting, and those comments are often published. DSOF at ¶¶ 118-19. Plaintiff's Facebook posts are similarly picked up and published by media outlets. Id. at ¶ 120. And Plaintiff has filed at least ten libel claims against Albanian news organizations in the last seven years, which lawsuits are themselves the subject of press releases put out by his attorneys. Id. at ¶ 116; Ex. 68 to McNamara Decl. , ECF No. 140, at p. 44. The result of all this media contact is reflected in a survey produced by Plaintiff, which shows that he has a remarkable "100%" name recognition among the population of Albania. Ex. A to Suppl. McNamara Decl. , ECF No. 167-2, at p. 7 (out of 1,000 respondents, all 1,000 answered "Yes" to the question: "Do you know who Shkelzen Berisha is?").
F. Lawson's Research for the Book
On June 28, 2011, Lawson entered into a publishing agreement with S & S to expand his Rolling Stone article into a book. DSOF at ¶ 57. Under the agreement, Lawson assumed sole responsibility for ensuring that the book was factually accurate. Id. at ¶ 58. Neither S & S nor Recorded Books, which purchased the right to record an audio version of the book, performed any fact-checking on it. Id. at ¶ 59-60.
Lawson spent four years conducting interviews and reviewing tens of thousands of pages of documentary evidence, including the two New York Times articles, the Broward Palm Beach New Times article, the New Republic article, the leaked diplomatic cables, the Klosi and Feinstein books and the Al Jazeera broadcast referenced above. Id. at ¶¶ 62, 82-100.
Lawson also entered into "life rights" agreements with Packouz and Podrizki. Id. at ¶ 63. Under those agreements, Packouz and Podrizki provided Lawson with interviews, access to documents and other services, while Lawson retained exclusive editorial control over the book's content. Id. at ¶ 64. As with Packouz, Lawson states that he found Podrizki to be an "extremely reliable source[ ]." Id. at ¶ 65. Packouz and Podrizki, for their part, maintain that they "told Lawson the truth to the best of their ability." Id. at ¶ 66.
To flesh out the details of the Tirana meeting allegedly attended by Plaintiff, Lawson relied on the account given him by Podrizki, as well as the latter's identification of Plaintiff from a photograph Lawson provided. Id. at ¶ 101. While Podrizki had previously been unable to identify Plaintiff during an interview with law enforcement, the photograph used in that earlier attempt had been of poor quality. Id.
Lawson also interviewed Erion Veliaj, a political opponent of Plaintiff's father and the current mayor of Tirana, who told Lawson that in Albania the Berishas were known simply as "the family," and that they were the "chief fixers in th[e] country." Lawson Decl. , ECF No. 126, at ¶¶ 70-71. Veliaj told Lawson that he suspected *1154 "that Plaintiff was involved in the corrupt AEY deal[.]" Id.
Lawson interviewed Andi Belliu, a former worker at the Gerdec munitions facility, who called Plaintiff the "shadow" behind that ill-fated project. DSOF at ¶ 104. Belliu wrote in a follow-up email that MEICO was "an albanian style mafia company [sic ]" that was "backed up by Shkelzen Berisha." Id. at ¶ 104.
Lawson also communicated with the late Kosta Trebicka's daughter, who told him that she considered Plaintiff a suspect in her father's mysterious death. Id. at ¶ 106. She told Lawson that her father had said he was removed from the AEY repackaging deal because "Berisha's son ... wanted it for himself." Id. at ¶ 107.
G. Plaintiff's Complaint
Plaintiff brought this action against Defendants in June 2017, alleging one count of defamation and one count of defamation per se. Compl. , ECF No. 1, at ¶¶ 143-67. In the Complaint, Plaintiff challenges five specific statements made about him by Lawson.[5]
First, a scene in Lawson's book describes the meeting in Tirana attended by Diveroli, Packouz, Podrizki, Pinari, Delijorgji and "a young man ... sitting in the corner." Compl. , ECF No. 1, at ¶ 87. The book states: "Dressed in a baseball cap and a sweater, [the young man] had dark hair, a soft chin, and sharklike eyes. He wasn't introduced. This was Shkelzen Berisha, the son of the prime minister of Albania, they would later be told by Pinari. Shkelzen was part of what was known in Albania as 'the family,' the tight-knit and extremely dangerous group that surrounded and lived at the beneficence of the prime minister .... The son of the prime minister remained silent.... Diveroli and Podrizki departed.... 'Did we just get out of a meeting with the Albanian mafia?' Podrizki joked. 'Absolutely. Absofuckinglutely.' " Id.
Later, the book states that "Diveroli had agreed to cut Trebicka out of the repacking job, which was now being done by a company ... seemingly controlled by the prime minister's son and Mihail Delijorgji." Id. at ¶ 103.
The book also quotes the recorded conversation between Diveroli and Trebicka that was printed in the original New York Times article, in which Diveroli said: "[The corruption] went up higher to the prime minister and his son. I can't fight this mafia. It got too big. The animals just got out of control." DSOF at ¶ 27; see also Compl. , ECF No. 1, at ¶ 105.
In the book's photograph section, Plaintiff's image appears with the caption: "Also involved, the dudes[6] discovered, was the prime minister's son, Shkelzen Berisha." Compl. , ECF No. 1, at ¶ 104.
Finally, in a 2016 interview on Albanian television, Lawson stated: "[T]he ex-prime-minister's son met with the Dudes when they were in Albania to arrange the delivery and repackaging of these munitions at ... twice the price that the Albanian government was getting.... So what happened to all that money? Well, the implication is clear that the prime minister's son, *1155 ... and other officials, were profiteers and the money was shipped off to a Cyprus holding company and then vanished." Id. at ¶ 108.
Plaintiff contends that these statements "demonstrate malice, egregious defamation, and grave insult." Id. at ¶ 169. Plaintiff seeks a court order requiring that the statements referring to him be "remove[d]" from Lawson's book, as well as compensatory damages of $ 60 million and additional, punitive damages. Id.
II. LEGAL STANDARDS
A. Summary Judgment
"A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought." Fed. R. Civ. P. 56(a). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. In reviewing a motion for summary judgment, the court is "required to view the evidence and all factual inferences therefrom in the light most favorable to the non-moving party, and resolve all reasonable doubts about the facts in favor of the non-movant." Feliciano v. City of Miami Beach , 707 F.3d 1244, 1247 (11th Cir. 2013) (quoting Skop v. City of Atlanta , 485 F.3d 1130, 1143 (11th Cir. 2007) ).
B. Defamation Claims
Under Florida law, a plaintiff alleging defamation must prove five elements: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." Turner v. Wells , 879 F.3d 1254, 1262 (11th Cir. 2018) (citing Jews For Jesus, Inc. v. Rapp , 997 So. 2d 1098, 1106 (Fla. 2008) ). An otherwise false and defamatory statement is considered defamatory per se , obviating the need to prove special damages, if "it charges that a person has committed an infamous crime ... [or] it tends to injure one in his trade or profession." Klayman v. Judicial Watch, Inc. , 22 F. Supp. 3d 1240, 1247 (S.D. Fla. 2014) (quoting Richard v. Gray , 62 So. 2d 597, 598 (Fla. 1953) ).
"The test for determining liability in a defamation case turns on whether the libeled party is a public or private figure and on whether the defamatory publication addresses a public or private concern." Silvester v. Am. Broad. Cos. , 839 F.2d 1491, 1493 (11th Cir. 1988). "If the injured party is a public figure or official and the defamatory material involves issues of legitimate public concern, the plaintiff must prove that the defendant acted with actual malice to establish liability." Id. (citations omitted). Issues of legitimate public concern include "all matters of corruption." Id. ; see also Rosanova v. Playboy Enters. , 580 F.2d 859, 861 (5th Cir. 1978) ("The nature of [plaintiff's] reported associations and activities concerning organized crime, are, without dispute, subjects of legitimate public concern.").
As to whether a plaintiff is a public figure, that "is a question of law to be determined by the court[.]" Turner , 879 F.3d at 1271 (quoting Mile Marker, Inc. v. Petersen Publ'g, LLC , 811 So. 2d 841, 845 (Fla. Dist. Ct. App. 2002) ). In making that determination, the court must be guided by two "fundamental" criteria. Silvester , 839 F.2d at 1494. "First, public figures usually have greater access to the media which gives them 'a more realistic opportunity to counteract false statements than private individuals normally enjoy.' " Id.
*1156 (quoting Gertz v. Robert Welch, Inc. , 418 U.S. 323, 344, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) ). Second, public figures "voluntarily expose themselves to increased risk of injury from defamatory falsehoods concerning them." Silvester , 839 F.2d at 1494 (quoting Gertz , 418 U.S. at 345, 94 S.Ct. 2997 ). Although the second factor has been labeled the "more important[ ]" of the two, id. , it is nevertheless "possible for someone to become a public figure through no purposeful action of their own." Turner , 879 F.3d at 1273 (quoting Friedgood v. Peters Publ'g Co. , 521 So. 2d 236, 239 (Fla. Dist. Ct. App. 1988) ); see also Rosanova , 580 F.2d at 861 ("It is no answer to the assertion that one is a public figure to say, truthfully, that one doesn't choose to be.").
The court must also determine "which type of public figure" a plaintiff is. Turner , 879 F.3d at 1272. "[T]he Supreme Court has identified two types of public figures in this context." Tobinick v. Novella , 848 F.3d 935, 945 n.9 (11th Cir. 2017), cert. denied , --- U.S. ----, 138 S. Ct. 449, 199 L.Ed.2d 348 (2017). General public figures are those who "occup[y] positions of such persuasive power and influence that they are deemed public figures for all purposes." Id. (quoting Silvester , 839 F.2d at 1494 ). "A limited public figure, by contrast, 'ha[s] thrust [himself] to the forefront of particular public controversies in order to influence the resolution of the issues involved.' " Tobinick , 848 F.3d at 945 n.9 (quoting Silvester , 839 F.2d at 1494 ). "If the existence of a public controversy is established, ... the court must apply a two-part test to determine if a specific individual is a limited public figure for the purpose of that controversy." Turner , 879 F.3d at 1272-73. "First, the court must determine whether the individual played a central role in the controversy." Id. at 1273. "Second, it must determine whether the alleged defamation was germane to the individual's role in the controversy." Id.
Both general and limited public figures must prove by clear and convincing evidence "that the defamatory statements were made with actual malice." Tobinick , 848 F.3d at 945 & n.9. "This is a subjective test," requiring proof "that the false statement was made 'with knowledge that it was false or with reckless disregard of whether it was false or not.' " Turner , 879 F.3d at 1273 (quoting Michel v. NYP Holdings , 816 F.3d 686, 702 (11th Cir. 2016) ). This is also a stringent test: It is not enough to show the "existence of a false statement," the "failure to conduct a thorough and objective investigation," or even "ill will" on the part of a defendant. Tobinick , 848 F.3d at 946-47. Indeed, even an "extreme departure from professional [journalistic] standards" is "plainly" insufficient to sustain a finding of actual malice. Harte-Hanks Commc'ns, Inc. v. Connaughton , 491 U.S. 657, 665, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). What is required is proof that "the defendant 'actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false.' " Turner , 879 F.3d at 1273 (quoting Michel , 816 F.3d at 702-03 ).
III. DISCUSSION
Defendants move for summary judgment on both counts of the Complaint. Defs.' Mot. for Summ. J. , ECF No. 138, at p. 1. Defendants argue that Plaintiff is, if not a general public figure, at least a limited public figure for purposes of the AEY arms-dealing controversy recounted in Lawson's book. Id. at pp. 13-17. As a public figure, they say, Plaintiff must prove by clear and convincing evidence that Defendants acted with actual malice *1157 in publishing the challenged statements.[7] Id. at p. 17. Defendants argue that Plaintiff cannot make that showing where the statements were based on a wealth of evidence, including multiple prior reports from reputable news organizations, all with the same import: that Plaintiff was involved in corrupt arms dealing in Albania. Id. at pp. 17-18. For the reasons set forth below, the Court agrees with Defendants in each respect.[8]
A. Plaintiff's Public Figure Status
"The test for determining liability in a defamation case turns on whether the libeled party is a public or private figure and on whether the defamatory publication addresses a public or private concern." Silvester , 839 F.2d at 1493. The challenged statements in this case describe corruption in the Albanian government and in the sale of arms to the United States for use in the war in Afghanistan. As the Parties do not dispute, these are matters of public concern. See, e.g., id. ("The public is legitimately interested in all matters of corruption[.]").
The critical question, then, is whether Plaintiff is a public figure. This is a question of law, Turner , 879 F.3d at 1271, and in answering it the Court must be guided by two "fundamental" criteria. Silvester , 839 F.2d at 1494. "First, public figures usually have greater access to the media which gives them 'a more realistic opportunity to counteract false statements than private individuals normally enjoy.' " Id. (quoting Gertz , 418 U.S. at 344, 94 S.Ct. 2997 ). Second, public figures "voluntarily expose themselves to increased risk of injury from defamatory falsehoods concerning them." Silvester , 839 F.2d at 1494 (quoting Gertz , 418 U.S. at 345, 94 S.Ct. 2997 ).
Here, Plaintiff is the son of Sali Berisha, who has been both the President and the Prime Minister of Albania. DSOF at ¶ 3. As is undisputed, Plaintiff is alleged to have been at the epicenter of not one but two major arms-dealing scandals. Id. at ¶ 114. The first was the AEY Albanian deal that was the subject of Lawson's book. Id. The second was the Gerdec disaster, which resulted in 26 deaths, hundreds of injuries and the conviction of Ylli Pinari, the head of Albania's state-run Military Export Import Company. Id. The Gerdec disaster has been likened to a "Political *1158 Hiroshima" in the Albanian press. Id. Plaintiff is also alleged to have been involved in corruption surrounding the privatization of an energy utility company and Albania's national lottery. Id. at ¶ 115. Not all of the press has been negative: Plaintiff also receives attention through his relationship with Armina Mevlani, an Albanian celebrity who has approximately one million social media followers. Id. at ¶ 121; Ex. 68 to McNamara Decl. , ECF No. 140, at p. 41. Nevertheless, for better or worse, Plaintiff has attained a level of "fame or notoriety in [his] community" that few other figures could likely match. Turner , 879 F.3d at 1272. Indeed, a survey produced by Plaintiff shows that he has an astonishing 100 percent name recognition among Albanians. Ex. A to Suppl. McNamara Decl. , ECF No. 167-2, at p. 7.
Plaintiff argues that all of the above may be true, but it is despite his best efforts. In other words, Plaintiff argues that he has not "voluntarily expose[d]" himself to the public spotlight and its attendant "risk of injury from defamatory falsehoods." Silvester , 839 F.2d at 1494 (quoting Gertz , 418 U.S. at 345, 94 S.Ct. 2997 ). Plaintiff insists that, although he is the son of Albania's former national leader, he "has attempted to lead a private life." PSOF at ¶ 139. If Plaintiff has ever had to interact with the press, he says, it was only "in response to false allegations manufactured by opponents of [his] father." Id. Apart from that, Plaintiff claims that he "has never voluntarily sought media attention," and he "has never had[ ] privileged access" to the press. Id. Indeed, Plaintiff states that he has "specifically requested that [Ms. Mevlani] limit the posting of photographs that include" him on social media. Id.
Plaintiff's claim that he "has never had[ ] privileged access to the media" is difficult to square with the fact that he is in direct email contact with numerous Albanian journalists and editors, as well as the fact that his Facebook posts have been published in news articles. DSOF at ¶¶ 118-20. But, even if the Court credits Plaintiff's assertions, "the status of public figure vel non does not depend upon the desires of an individual." Rosanova , 580 F.2d at 861. Plaintiff did not choose to be the former Albanian Prime Minister's son, but that is what he is, and other "children of famous parents" have been held to be public figures on no wider grounds than that. Meeropol v. Nizer , 381 F. Supp. 29, 34 (S.D.N.Y. 1974) (finding that the children of Julius and Ethel Rosenberg were public figures despite having "renounced the public spotlight" as adults), aff'd , 560 F.2d 1061 (2d Cir. 1977).
Moreover, Plaintiff's claim that he has not voluntarily sought attention is "no answer to the assertion that [he] is a public figure" where, as here, Plaintiff "has been the subject of published newspaper and other media reports" connecting him with "organized crime." Rosanova , 580 F.2d at 861. In Rosanova , as in this case, plaintiff sued for defamation based on defendant's printed reference to him "as a 'mobster.' " 580 F.2d at 860. There, as here, plaintiff "assert[ed] that he ha[d] never sought" to be a public figure, "and that, in truth, he ought not have become one." Id. at 861. The Fifth Circuit rejected this argument and found plaintiff to be a public figure. Id. As is the case here, the court noted that there had been "widespread media reports" about plaintiff's alleged "associations and activities concerning organized crime," which were, "without dispute, subjects of legitimate public concern." Id. "Comment upon people and activities of legitimate public concern," the court observed, "often illuminates that which yearns for shadow." Id.
The Florida state court case of Friedgood v. Peters Publishing Co. is also instructive.
*1159 In Friedgood , the District Court of Appeal noted that in some defamation cases "the issues of truth [of defendant's statement] and voluntariness [of plaintiff's entry into the controversy] are the same and are in dispute[.]" 521 So. 2d at 240. The instant case falls within that category. Here, Plaintiff contends that he is a "private citizen" who has been dragged into a public controversy through Defendants' "elaborate deceptions." Pl.'s Mem. in Opp'n , ECF No. 153, at pp. 1, 20. If Defendants' statements about him were in fact deceptions, then Plaintiff's participation in the controversy "would be involuntary." Friedgood , 521 So. 2d at 240. If, on the other hand, the Prime Minister's son was involved in organized crime and arms trafficking, then it would have to be said that he had "voluntarily engaged in a course that was bound to invite attention and comment." Rosanova , 580 F.2d at 861. Friedgood 's solution is simple: Where the issues of truth and voluntariness are so entangled, a plaintiff can be deemed a public figure "without regard to whether ... [he] initially thrust [him]self into the case." 521 So. 2d at 240. Instead, "the other factors, prominence and access to media, alone may be examined to determine public figure status." Id.
Judged by the standards set forth above, it is clear that Plaintiff is a public figure in Albania. His proximity to power, his access to the media and his alleged presence at the center of multiple corruption scandals all compel that finding.
The harder question is one the Parties have not briefed. That question is whether it matters where Plaintiff is a public figure. The Parties have focused on Plaintiff's status in Albania, including his universal public awareness there. But Lawson's book was not published solely for an Albanian audience. And while Plaintiff has not pointed to any surveys showing his name recognition in, say, the United States, it is safe to assume that the figure is less than 100 percent. To be sure, Plaintiff would feel any defamatory "sting" less sharply in a country where he is not a household name, but he would also have fewer means to defend himself there. See Gertz , 418 U.S. at 344, 94 S.Ct. 2997 (1974) ("[P]ublic figures usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements[.]").
As noted, Plaintiff has failed to make any arguments in this connection. Even if the Court were to reach the issue, however, the case law shows that Plaintiff should be deemed at least a "limited" public figure for purposes of the AEY controversy. For example, in Lluberes v. Uncommon Productions, LLC , the First Circuit Court of Appeals expressly rejected plaintiffs' "geographic" argument that they were not "public figures in the United States." 663 F.3d 6, 20 (1st Cir. 2011). Plaintiffs in that case were the owners of sugarcane plantations in the Dominican Republic, who sued over their depiction in a film exposé called "The Price of Sugar." Id. at 10. The First Circuit noted that a limited public figure is "defined ... not in terms of geography but in terms of the controversy that he has stepped into." Id. at 20. In that case, the controversy in which plaintiffs were involved "was not confined to the shores of the Dominican Republic," but "resounded in the United States." Id. at 21. The court therefore upheld their designation as "public figures in the United States for purposes of this lawsuit." Id.
The Fifth Circuit Court of Appeals reached similar conclusions in two cases, Trotter v. Jack Anderson Enterprises and Time, Inc. v. McLaney . In Trotter , plaintiff was an American lawyer "who was president of a Guatemalan soft drink bottling *1160 company." 818 F.2d 431, 432 (5th Cir. 1987). He sued for defamation based on articles in the United States describing him as an "orchestrator[ ]" of "anti-union violence" at a bottling plant in Guatemala. Id. The Fifth Circuit, noting that what happens in foreign countries can be of "domestic concern," affirmed the district court's finding that plaintiff was a limited public figure, notwithstanding his "low public profile" in the United States. Id. at 433-36. Similarly, in McLaney , plaintiff was a "professional gambler" who sued based on a Life magazine article linking him to the political machinations of "mobsters" in the Bahamas. 406 F.2d 565, 567-70 (5th Cir. 1969). The court held that plaintiff was a public figure, noting that allegations of corruption "in a small foreign country" were a "proper subject of inquiry and of public interest" in the United States. Id. at 573.
In this case, Plaintiff is widely reported to have been involved in several distinct corruption scandals in his home country of Albania. DSOF at ¶¶ 114-15. One of those was the AEY controversy at issue here, a controversy that involved an American defense contractor selling Chinese ammunition, acquired in Albania, to the United States military for use in the war in Afghanistan. Id. at ¶ 114. This was a matter of public interest in the United States, and no doubt in much of the rest of the world as well. While the Court presumes that Plaintiff does not enjoy the same prominence and access to media in this country as he does in his own-and, again, Plaintiff has not made this point himself-Plaintiff nevertheless has significant resources at his disposal, and certainly no less than were available to the "professional gambler" in McLaney, 406 F.2d at 570.
Finally, the Court finds that Plaintiff meets the "two-part test" used "to determine if a specific individual is a limited public figure for the purpose of [a public] controversy." Turner , 879 F.3d at 1272-73. First, Plaintiff's role in the AEY controversy was "central." Id. at 1273. Plaintiff was alleged to have been personally present at the 2007 meeting in Tirana along with Diveroli, Pinari and others, and to have been positioned at the "high[ ]" end of Albania's corruption ladder. DSOF at ¶¶ 19-22, 27. Second, "the alleged defamation" was "germane" to Plaintiff's role in the AEY controversy-indeed, that Plaintiff was centrally involved in the controversy was the alleged defamation. Id.
Accordingly, the Court finds that Plaintiff is a limited public figure for purposes of the controversy at issue in this case. As a public figure, Plaintiff must demonstrate actual malice to prevail in his defamation claim.
B. Actual Malice
In his response to Defendants' motion for summary judgment, Plaintiff has made clear what his argument for actual malice would be if this case went to trial. Plaintiff's theory is that Diveroli, Defendant Packouz and Defendant Podrizki "conspired" in order "to fabricate [Plaintiff's] involvement" in AEY's Albanian deal. Pl.'s Mem. in Opp'n , ECF No. 153, at p. 15. Plaintiff contends that the "dudes" did so in order to scare off Kosta Trebicka, whom they had decided to remove from his role in repackaging the ammunition. Id. at pp. 3, 15, 17. Years later, when Defendant Lawson was writing his book, Packouz and Podrizki recognized that it was "in [Lawson's] interest-financially and professionally-to tell a new, bigger story," and they obligingly told him "what he wanted to hear." Id. at pp. 3-4. Packouz and Podrizki gave Lawson a " 'good' story" about "Albanian corruption," which Lawson used to sell copies of his book. Id. at pp. 4-5. In *1161 return, Lawson paid Packouz and Podrizki for their "life rights," and provided them with "reputational rehabilitation" by portraying them positively in the book. Id. at p. 3.
Plaintiff's conspiracy theory falls far short of establishing actual malice by clear and convincing evidence. See Gertz , 418 U.S. at 342, 94 S.Ct. 2997. In order to meet that standard, Plaintiff must prove that Defendants "actually entertained serious doubts as to the veracity of the published account, or [were] highly aware that the account was probably false." Turner , 879 F.3d at 1273 (quoting Michel , 816 F.3d at 702-03 ). Here, Lawson and his publishers were no doubt motivated by the desire to sell books-but that motive is "immaterial" in this context. New York Times Co. v. Sullivan , 376 U.S. 254, 266, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Likewise, the fact that Packouz and Podrizki were paid as part of "life rights" agreements, which are "standard" in the book publishing industry, does not establish actual malice on their part or on Lawson's. DSOF at ¶ 63; cf. Silvester , 839 F.2d at 1498 & n.5 (rejecting plaintiff's actual malice claim where one of the sources for the allegedly defamatory news report was hired and paid as a "consultant"). As for the effect of Lawson's book on Packouz's and Podrizki's reputations, that can only be guessed.
Set against Plaintiff's insinuations is the critical fact that, by the time Lawson's book was published in 2015, Plaintiff's alleged involvement in arms dealing was already the subject of "widespread media reports." Rosanova , 580 F.2d at 861. First, in 2008, the New York Times published a front-page article about AEY. DSOF at ¶ 34; Ex. 2 to Lawson Decl. , ECF No. 126-2, at p. 1. The Times article quoted Trebicka's "secretly recorded" call with Diveroli, in which the latter stated that the "prime minister and his son" were involved in "mafia" dealings. Ex. 2 to Lawson Decl. , ECF No. 126-2, at pp. 2, 12. Later the same year, the Times published a second article reporting that Trebicka had been "found dead ... on a rural roadside." Ex. 6 to Lawson Decl. , ECF No. 126-6, at p. 2. The article again noted Trebicka's recorded call with Diveroli, stating that "Mr. Diveroli [had] said the corruption went all the way up to the Albanian prime minister, Sali Berisha, and his son." Id. at p. 4.
Later articles in the Broward Palm Beach New Times and the New Republic repeated this information about Plaintiff's alleged involvement in the AEY deal. DSOF at ¶¶ 86, 97; Ex. 7 to Lawson Decl. , ECF No. 126-7, at p. 2 ; Ex. 16 to Lawson Decl. , ECF No. 126-17, at p. 6. Indeed, it was not only in articles that this claim appeared but also in two books published prior to Lawson's-one in the United States and one in Albania. Ex. 10 to Lawson Decl. , ECF No. 126-10, at pp. 6-7 ; Ex. 15 to Lawson Decl. , ECF No. 126-16, at pp. 3-4.
Plaintiff argues that all of the publications that followed the original Times article were merely repeating what that first article had said, and that article, in turn, was based solely on Diveroli's comments in the recorded call with Trebicka. Pl.'s Mem. in Opp'n , ECF No. 153, at p. 19. Thus, rather than representing the independent investigations of so many news sources, all of these stories boiled down to a single comment made by Diveroli, whom Plaintiff more than once describes as a "pathological liar." Id. at pp. 10, 19, 27.
There are several problems with this argument. First, it is well established that "[t]he failure to conduct a thorough and objective investigation, standing alone, does not prove actual malice[.]" Tobinick , 848 F.3d at 947. The New York Times article that first broke the AEY story presented Diveroli's "secretly recorded" comments *1162 as news fit to print, Ex. 2 to Lawson Decl. , ECF No. 126-2, at p. 2, and Lawson was entitled to rely on that "previously published report[ ]" from a "reputable source[ ]." Liberty Lobby, Inc. v. Dow Jones & Co. , 838 F.2d 1287, 1297 (D.C. Cir. 1988) ; see also, e.g., Fodor v. Berglas , 1995 WL 505522, at *5 (S.D.N.Y. Aug. 24, 1995) (no actual malice where defendant "bas[ed] his conclusions on only one source, namely an article previously published in New York Magazine").
In any event, Lawson did conduct his own investigation, which included interviews with sources who corroborated Diveroli's claim. First, and critically, Lawson relied on the account given to him by Podrizki, who identified Plaintiff as being at the Tirana meeting. DSOF at ¶ 101. Lawson also interviewed Erion Veliaj, the mayor of Tirana, who told Lawson that he believed "Plaintiff was involved in the corrupt AEY deal[.]" Lawson Decl. , ECF No. 126, at ¶¶ 70-71. Lawson interviewed Andi Belliu, a former worker at the Gerdec factory, who called Plaintiff the "shadow" behind the factory and implicated him in "mafia" dealings. DSOF at ¶ 104. Finally, Lawson spoke with Trebicka's daughter, who said that her father had been removed from the AEY deal in order to make way for "Berisha's son." Id. at ¶ 106-07. Trebicka's daughter also told Lawson that she considered Plaintiff a suspect in her father's death. Id. at ¶ 106.
Still another problem with Plaintiff's argument is that the New York Times article was not the only original reporting available about Plaintiff's alleged "mafia" ties. In fact, there was an entire body of reporting about Plaintiff's alleged involvement in the Gerdec disaster, not the least of which was the half-hour Al Jazeera segment entitled "Bullets and Bucks," which Plaintiff himself concedes was "damning." Id. at ¶ 90. Diveroli's recorded comments were not the only evidence underlying this reporting, as Plaintiff appears to have been explicitly referred to in documents tied to the Gerdec project. See Ex. 8 to Lawson Decl. There were also the cables of the former U.S. Ambassador to Albania, disseminated by WikiLeaks in 2011. DSOF at ¶ 92. In one of those cables, the Ambassador reported that the former head of the Albanian army had come to him out of fear for his own safety, stating that Plaintiff had put him under "direct pressure" to continue delivering "high caliber ammunition to Gerdec and to do so without delay." Id.
As Defendants note, a critical consideration in any defamation case under Florida law is the "gist or sting" of the challenged statements. Levan v. Capital Cities/ABC, Inc. , 190 F.3d 1230, 1240 (11th Cir. 1999). Here, the gist of Lawson's book about AEY and the gist of the reporting on Gerdec were the same, insofar as they related to Plaintiff. The gist of both stories was that Plaintiff had been involved in corrupt dealings surrounding Albania's vast, largely defunct, but still dangerous Cold War arsenals. Thus, it was not Lawson who broke the story about Plaintiff-as Defendants put it, by the time Lawson's book came out in 2015, these allegations were already "old news." Defs.' Mot. for Summ. J. , ECF No. 138, at p. 2. Lawson merely incorporated the story into his book, and in doing so he was entitled to rely on the "multitude of previous reports" implicating Plaintiff in arms-related scandals. Rosanova , 580 F.2d at 862.
Plaintiff argues that Lawson cannot "feign[ ] reliance" on those prior reports because Lawson knew more than the other reporters knew-in particular, he knew that Diveroli, Packouz and Podrizki were all "liars and criminals." Pl.'s Mem. in Opp'n , ECF No. 153, at pp. 1-2. Plaintiff emphasizes that Defendants Packouz and *1163 Podrizki, Lawson's "primary sources" for the book, had both defrauded the government, forged documents and used false identities, in addition to "many other misdeeds." Id. However, while Lawson asserts that he found Packouz and Podrizki to be reliable sources, DSOF at ¶¶ 48, 65, he hardly presented them to his readers as unassailable witnesses-indeed, the book ends with both of them being convicted of fraud. Id. at ¶¶ 42-44; cf. Michel , 816 F.3d at 703 ("[W]here a news report inform[s] its audience that its primary source [is] 'not an unimpeachable source of information,' it serve[s] to undermine claims showing that the report was issued with actual malice." (quoting Silvester , 839 F.2d at 1498 )).
As for Diveroli, who is no longer a party to this case, Plaintiff characterizes him as a "pathological liar" unworthy of belief-except, that is, when Plaintiff is citing Diveroli as a witness. Pl.'s Mem. in Opp'n , ECF No. 153, at p. 10 & n.1 ("Diveroli admits that he made-up [sic ] the story about Plaintiff's involvement[.]"). To be sure, Diveroli, whose recorded call with Trebicka was the source of the original Times article, now denies that Plaintiff was involved in AEY's Albanian deal. Id. at p. 10 n.1. So does the former head of MEICO, Ylli Pinari, who was deposed and convicted following the Gerdec disaster. Id. And so did Trebicka himself, before he was "found dead ... on a rural roadside" in eastern Albania. Ex. 6 to Lawson Decl. , ECF No. 126-6, at p. 2. But that does not mean that Diveroli, Pinari and Trebicka are the ones who must be believed. A review of the record in this case indicates that arms dealing has at times been a shady business. Here, Lawson, an experienced investigative journalist reporting on the AEY controversy, had to rely on the witnesses to the story whom he found to be most credible. Lawson concluded that Packouz and Podrizki were those witnesses, and the Court declines to second guess him.
The remainder of Plaintiff's response papers is devoted to cataloguing examples of Defendants' "elaborate deceptions" and "slipshod, bad-faith reporting." Pl.'s Mem. in Opp'n , ECF No. 153, at p. 1. Several of these examples have nothing to do with Plaintiff himself, and some never made it into Lawson's book. See id. at pp. 5-6, 11-12. Among the examples that have more direct bearing on the case, the key one Plaintiff focuses on is the scene in Lawson's book describing the 2007 meeting in Tirana. See id. at p. 9. Plaintiff argues that Lawson distorted the evidence to bolster his claim that Plaintiff was the silent young man sitting in the corner at the meeting. Id. Ultimately, however, Plaintiff's defamation claim does not turn on this narrow point. Rather, Plaintiff's claim turns on whether "the 'gist' or 'sting' of the [challenged] statement[s] is defamatory." Levan , 190 F.3d at 1240. Here, the "gist" of Lawson's reporting, and of myriad other reports by reputable news organizations for several years running, was that Plaintiff had his hands in the corrupt management of Albania's aging weapons stockpiles. That Plaintiff attended a specific meeting on that subject was not, as he claims, a "fundamentally different" allegation from those that had long been "swirling in the ... media." Stern v. Cosby , 645 F. Supp. 2d 258, 271 (S.D.N.Y. 2009) ; cf. Ex. 8 to Lawson Decl. (Al Jazeera reporting that Plaintiff attended "almost daily meetings" regarding the corrupt Gerdec project).
For all of these reasons, Plaintiff has failed to show that Defendants "actually entertained serious doubts as to the veracity of the[ir] published account, or [were] highly aware that the account was probably false." Turner , 879 F.3d at 1273 (quoting Michel , 816 F.3d at 702-03 ). Defendants'
*1164 motion for summary judgment must therefore be granted, and this case must be dismissed.
IV. CONCLUSION
Accordingly, it is hereby ORDERED and ADJUDGED that Defendants' Motion for Summary Judgment (ECF No. 138 ) is GRANTED . The Clerk shall CLOSE this case. All pending motions are DENIED as moot . A separate judgment will issue pursuant to Rule 58 of the Federal Rules of Civil Procedure.
DONE and ORDERED in Chambers in Miami, Florida, this 21st day of December 2018.

Diveroli was originally named as a Defendant in this action. Compl. , ECF No. 1. By Order dated May 9, 2018, the Court dismissed the claims against Diveroli, as well as those against Incarcerated Entertainment, LLC, and terminated both Defendants from the case. Order , ECF No. 70.

Cinema fans will recognize this plot from the 2016 film War Dogs , which was adapted from Lawson's book.

Whether there was only one meeting with all the parties, or an initial meeting with Pinari followed by a second meeting, is not clear. See DSOF at ¶¶ 18-19; Diveroli Decl. , ECF No. 152-36, at ¶¶ 13-14.

A copy of the video report was conventionally filed and has been reviewed by the Court.

Plaintiff also challenges statements that do not refer to him, but rather refer to the Albanian Prime Minister or to "Albanian mobsters" in the abstract. Compl. , ECF No. 1, at ¶¶ 101-02, 107. This Order does not address those statements, which, in any event, can only have the same thrust as the statements listed here-namely, that Plaintiff has ties to the mafia and has engaged in arms dealing.

Per the book's title, Diveroli, Packouz and Podrizki are referred to as "the dudes" throughout the record and the Parties' motion papers.

For purposes of their motion for summary judgment, Defendants assume arguendo that the challenged statements are false. Defs.' Mot. for Summ. J. , ECF No. 138, at p. 13 n.6. This Order proceeds on the same assumption.

Defendants have also filed a motion pursuant to Section 768.295 of the Florida Statutes ("the SLAPP Statute"). Defs.' SLAPP Mot. , ECF No. 134. In that motion, Defendants ask the Court to hold a hearing on and resolve their summary judgment motion on "an expedited basis," and to award them attorneys' fees. Id. at p. 3. However, the cases Defendants cite in support of their request do not establish that the SLAPP Statute must be applied here. See, e.g., Tobinick , 848 F.3d at 944 (holding that plaintiffs had "waived their challenge to the district court's application of California's anti-SLAPP statute"). Nor does the Statute provide for attorneys' fees incurred in the "defense against an action that was filed in violation" of the Statute, as Defendants contend. Defs.' SLAPP Mot. , ECF No. 134, at p. 2. Rather, the Statute provides only for "attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section"-in other words, fees and costs incurred in connection with the SLAPP motion itself. Fla. Stat. § 768.295(4) (emphasis added). It further appears that such fees and costs can only be awarded after a hearing. See id. The Court finds that the stated purpose of the SLAPP Statute-the "expeditious resolution" of certain defamation claims, id. -would not be furthered by holding a hearing at this juncture. Accordingly, Defendants' SLAPP motion is, along with all other pending motions in this matter, denied as moot.